LANDRY, Judge.
All parties to these consolidated actions have appealed judgments which: (1) award plaintiffs, Luther S. Fortenberry and Joy L. Fortenberry (Vendor), damages for alleged breach by defendants, Victor McKnight and Wanda S. McKnight (Purchaser), of a contract to buy and sell a residence; (2) granting plaintiff, Jane Elizabeth Eanes, a real estate broker (Broker), a commission allegedly due by Purchaser, and (3) denying the reconven-tional demand of Mrs. McKnight for damages for pain and anguish allegedly resulting from these reputedly unfounded actions. We reverse the judgments rendered in favor of Vendor and Broker against Purchaser and otherwise affirm.
*493 The Fortenberrys seek recovery of $15,-632.80 in damages for alleged losses and attorney’s fees incurred as a result of the McICnight’s failure to purchase subject property. Mrs. Eanes, a real estate broker, seeks recovery of the commission allegedly earned in securing a purchaser pursuant to a listing agreement with the Forten-berrys, together with attorney’s fees incurred in instituting the action to recover the commission. Alternatively, Mrs. Eanes asks judgment against the Fortenberrys pursuant to a listing agreement which states that the seller shall be liable for the realtor’s commission should a proposed sale not be consummated due to the seller’s fault. Defendants reconvened alleging Vendor breached the agreement to buy and sell in that the Vendor failed to produce a termite certificate within the time limit specified in the agreement. Alternatively, defendants maintain the agreement to purchase was mutually rescinded by the return of their deposit check given to Mrs. Eanes. In the further alternative, defendants contend the defective condition of the residence justified their refusal to purchase the property. The reconventional demand of the McKnights asks damages in the sum of $5,000.00 for mental pain and suffering caused Mrs. McKnight by the institution of this litigation. The McKnights also third partied Mrs. Eanes and her husband, Buddy Eanes, praying for such judgment against said third party defendants as may be rendered against the McKnights as defendants in the main demands. Alternatively, Mr. and Mrs. McKnight pray that if the agreement be found to have not been mutually rescinded, they be awarded judgment in the sum of $1,500.00 for prosecuting an action to rescind the contract to buy and sell.
The trial court found that certain admitted defects in the residence were minor, that Vendor timely produced a termite certificate as called for in the agreement, and that Purchaser breached the agreement to buy and sell. Judgment was rendered below in favor of the Fortenberrys as follows: Attorney’s fees, $2,000.00; mortgage payments incurred between the breach by Purchaser and the subsequent sale to a third party, $832.80; interest payments, $300.00, and deposition costs, $102.00. Damages in the sum of $11,000.00 (the difference between the $49,000.00 price agreed to between purchaser and seller and the eventual sale price of $38,000.00) were denied on the ground that had Vendor demanded specific performance, as provided in the agreement, no loss, in this respect, would have been sustained. Judgment was also rendered below in favor of Mrs. Eanes for a broker’s commission in the sum of $2,940.00. The McKnights have appealed both judgments against them. Mrs. McKnight has neither in oral argument nor brief, mentioned the dismissal of her third party demand for damages for mental pain and anguish. This demand is therefore deemed abandoned. However, the Mc-Knights seek $1,500.00 as attorney’s fees should they successfully defend on the ground the premises were defective. Mrs. Eanes has also appealed seeking an additional $600.00 as attorney’s fees and further asking that in the event her judgment against the McKnights be set aside, she have judgment for her commission against Vendor. The Fortenberrys have likewise appealed seeking damages of $11,000.00 and praying that the award for attorney’s fees be increased from $2,000.00 to $2,500.00. We affirm in part, amend in part, reverse in part, and remand for further proceedings as hereinafter indicated.
On appeal, the McKnights have filed a peremptory exception of no cause of action alleging that the purchase agreement is not binding because Mrs. Fortenberry, being judicially separated from her husband, did not sign the contract.
On July 27, 1968, Mr. Fortenberry listed for sale with Mrs. Eanes Lot 20, Square 2, Glenmore Place Subdivision, East Baton Rouge Parish. On October 9, 1968, the McKnights signed an agreement to purchase the property for the sum of $49,-000.00, subject to certain terms therein *494 specified. Simultaneously the McKnights gave a $1,000.00 deposit check to Mrs. Eanes. The agreement stipulates that it remains effective until 6:00 P. M., Thursday, October 10; 1968, and that the act of sale was to be passed before the Purchaser’s notary within one week. It was accepted and signed on an undesignated date by Mr. Fortenberry only. Notwithstanding the absence of Mrs. Fortenberry’s signature, it is expressly stipulated in the record that the purchase agreement was timely accepted. The closing date was fixed for Friday, October 18, 1968, at the office of purchaser’s attorney, M. Aubrey McCleary, Jr. Purchasers commenced occupancy of the home on October 13, 1968. The parties met on October 18, 1968, at the appointed place. The seller did not produce a termite certificate on this occasion and purchaser declined to buy. The parties met again the following morning at approximately 11:00 A. M., on which occasion purchaser refused to execute a sale on the ground the premises were defective and needed extensive repair. On Sunday, October 20, 1968, the McKnights vacated the residence. Mrs. Eanes returned the McKnights’ $1,000.00 deposit check on or about November 1, 1968.
The peremptory exceptions filed by the McKnights on appeal assert the nullity of the agreement to buy and sell on the ground that Mrs. Fortenberry is not a signatory thereto. In this regard, it appears that the Fortenberrys were judicially separated prior to the date of the agreement, and that subject property belonged to the community of acquets and gains which theretofore existed between them. This would, of course, have required the wife’s signature to the agreement since the decree of separation dissolved the marital community. However, we note, as previously stated, that the record contains an express stipulation that the agreement to buy and sell was duly made and accepted. This judicial admission precludes an exception predicated on the alleged irregularity urged on appeal with respect to the agreement to buy and sell.
In essence, Purchaser herein pleads a redhibitory defect sufficient to annul the sale had it taken place. On this premise, it is contended that since the sale could have been avoided, Purchaser was justified in refusing to buy, and should not be held liable for the broker’s fee or any penalties provided in the contract for failure to buy. In this regard, the issue is whether the presence of a “hump” in the living room floor of the residence, and certain information conveyed to the Purchaser relative thereto, imposed on Purchaser the duty of making an inspection which would have revealed extensive damage to the understruc-ture of the home.
Vendor maintains the defect was apparent and known to Purchaser, thereby imposing upon Purchaser the obligation of making a thorough inspection of the premises. In so contending, Vendor relies upon Pursell v. Kelly, 244 La. 323, 152 So.2d 36, and Bonhagen v. Hooper, La.App., 195 So. 2d 447. Purchaser contends that the nature of the defect, and assurances with regard thereto given by Vendor and Broker, relieved them of the burden of making a detailed inspection of the home before executing the purchase agreement. The trial court resolved this factual issue against Purchaser. We concur.
Mrs. Jane Eanes’ testimony is that she showed the residence to the McKnights on three or four occasions. She noted that a hump existed in the living room floor and that there appeared to be some weakness in the flooring. She was sure the McKnights were apprised of this condition. She further stated that Mr. Fortenberry never mentioned having previously made temporary repairs to the substructure of the house or that there was extensive mildew or fungus rot to the sills and floor joists as was discovered subsequent to execution of the purchase agreement.
Mr. Ernest R. Eanes, Jr., employed as a salesman by his wife, Jane Eanes, testified *495 essentially that the living room floor of the residence had a hump and some sagging, which condition was discussed with purchasers. Contrary to Mr. Fortenberry’s testimony, Eanes stated that Fortenberry advised Purchaser that some work had been performed beneath the house. After the Purchaser declined to buy, Eanes inspected the substructure with Jerry Guy, an Engineer, and made an estimate of the cost of repair. Eanes was of the opinion that the cost of repair, regardless of the amount, was not a condition of the proposed sale. Eanes also stated he felt the sale was not consummated on October 18, because the Vendor did not produce a termite certificate as required by the contract. When Vendor and Purchaser met again the following day to discuss the transaction, Vendor produced a termite certificate. Mr. Eanes was of the opinion, before his inspection, that the condition of the living room floor was due to a moisture problem. He was aware, before October 18, 1968, that Mr. Fortenberry had made some repairs and felt that these were sufficient. He conceded that before October 18, 1968, he and Mr. McKnight had talked about the possibility of replacing some of the oak strip flooring and perhaps some of the sub-floor. Prior to October 18, Eanes was not aware that the understructure of the residence would require repair. Eanes also stated he did not advise McKnight that the understructure should be inspected, but rather informed McKnight that the substructure had been repaired by Fortenberry.
Mr. Fortenberry’s testimony is that approximately one year prior to the agreement in question, he had a handyman inspect the understructure of the residence because of a hump and a sag in the living room floor. At this time certain sills were replaced and other repairs made. Forten-berry conceded additional repairs were needed to the substructure and floor and that he declined to make them because he did not wish to invest any more money in the house. He also acknowledged that he did not advise McKnight as to the prior repairs made or as to the needed repairs. When the McKnights agreed to purchase, Fortenberry was aware that the living room had a hump in the floor; that the floor sagged or gave when walked upon and that in a corner of the east wall of the room there was a gap of 1 Yz or 2 inches between the baseboard and floor. Forten-berry admitted he did not have a termite certificate available on October 18, 1968, but procured an inspection early the following morning and picked up the certificate at the Bruce Terminix office at approximately 10:00 A. M. At approximately 11:00 A. M. that same day, he met with purchasers who declined to buy unless Fortenberry agreed to pay the cost of repairing the floor which Fortenberry refused to do.
Mrs. Joy Fortenberry testified in substance that several inspections of the house were made by persons selected by the Mc-Knights before the purchase agreement was executed. She knew there was a visible buckling of several boards in the living room floor, and that at one point there was a settling such that a gap of approximately one inch existed between the floor and wall. She maintained the living room floor was obviously weak and did not feel firm when walked upon. She acknowledged that repairs had been made to the substructure of the home approximately a year and a half prior to confection of the purchase agreement.
Mr. McKnight acknowledged he visited the premises several times before signing the purchase agreement. He noted a hump in the living room floor before the purchase contract was signed. Prior to signing the agreement, he had an electrician check the wiring primarily to see if sufficient circuits were present. He also had the plumbing checked principally to determine the cost and feasibility of changing the location of a water heater and installing additional appliances requiring plumbing connections. In addition, he had the residence checked by a contractor-acquaintance, Bob Doiron, primarily to obtain an appraisal as to its value. McKnight denied that Doiron advised further investí- *496 gation to determine the cause of the defect in the living room floor. He commenced occupancy on Tuesday, October 15, 1968. On or about October 18, 1968, an employee of Orkin Exterminators inspected the residence and declined to issue a termite certificate upon finding extensive fungus growth on the sills and floor joists. McKnight was advised that the cost of remedying the problem found would be considerable. This disclosure prompted him to have the house inspected the following morning by a contractor-acquaintance, Tony Cashio, and also by an architect, Ronald Couvillion. Mr. Cashio advised that repair work would entail raising the entire structure and replacing the foundation. Mr. Couvillion also reported considerable damage and suggested that further investigation be conducted to determine the full extent of repair needed. On Cashio’s recommendation, McKnight declined to sign the sale when the parties met late in the morning of Saturday, October 19, 1968. McKnight stated in effect that he did not make an inspection prior to signing the purchase agreement because he relied on Mr. Eanes’ assurance that the hump in the floor could be easily repaired by replacing the sub-floor. He also stated he considered the entire matter closed when Mrs. Eanes returned his $1,000.00 deposit check on or about November 1, 1968.
Mrs. McKnight testified she visited the residence four or five times before signing the purchase agreement. She directed her husband’s attention to the hump in the living room floor on either the first or second visit. She stated that Buddy Eanes assured her there was nothing seriously wrong with the floor, that only the sub-floor needed changing. Nevertheless, she had a premonition there was more to the condition than met the eye. As Mrs. McKnight explained, she lacked confidence in Eanes’ assurances, and added: “And I kept saying to Victor, I said I don’t believe it, I think there is more to it than that.” Mrs. McKnight also stated she was not aware of a separation between, the floor and the wall of the living room until after she assumed occupancy. She acknowledged that notwithstanding her misgivings about the condition of the floor, no inspection was made of the substructure prior to signing the agreement because she relied upon Eanes’ representations. She explained that before discovering the true condition of the house, she intended to replace the sub-floor in the affected area, replace a few oak flooring strips and carpet the room. When the true condition of the house was discovered, she advised her husband to decline the purchase.
Mr. Robert Doiron, contractor-acquaintance of the McKnights, testified he made a more or less casual inspection of the residence at Mr. McKnight’s request. He noted what he termed a “bounce” in the living room floor and suggested that an inspection be made to determine the cause.
Mr. Anthony Cashio, building contractor, and Mr. Ronald Couvillion, Architect-Engineer, testified that they inspected the un-derstructure of the residence on the morning of October 19, 1968, and on October 20, 1968, respectively, at Mr. McKnight’s request. In substance, each witness testified he found evidence of extensive dry rot which would necessitate considerable repair. Mr. Cashio advised McKnight not to purchase the property. Mr. Couvillion expressed the view that the condition noted could even affect the walls of the structure, but that such condition could not be determined without further inspection by opening the walls.
Mr. Basil L. Dodwell inspected the home at Fortenberry’s request in November, 1968. He detected dry rot in the sub-floor caused by excessive dampness beneath the house and also by old age. He estimated the cost of complete repair at $2,478.00. In January, 1969, Dodwell again inspected the residence at the request of Harry Ruben-stein who ultimately purchased the residence from the Fortenberrys. By agreement with Rubenstein, Dodwell repaired the living room floor only at a cost of $1,- *497 045.00. Dodwell noted that prior to his repair work, the floor of the living room had a slight rise in two places but was fairly sound and solid. He conceded that the full extent of repair necessary was ascertainable only upon disassembling of the floor.
Mr. Harry Rubenstein, neighbor to the Fortenberrys, testified he was familiar with the subject residence, having visited there almost daily for a number of years. He stated the living room floor of the home was very crooked and felt as though it was rotted underneath. Aware of such defects, he purchased the residence in January, 1969, for the sum of $38,000.00, and assumed immediate occupancy. Pursuant to contract with B. L. Dodwell, Rubenstein repaired the living room floor area at a cost of $1,045.00. He did not make any repairs to other areas of the house.
In effect, present purchasers plead a redhibitory vice in defense of plaintiff’s action to enforce an agreement to buy and sell real property. LSA-C.C. art. 2530 provides that a redhibitory action lies for the avoidance of a sale because of some vice or defect in the thing sold which renders the object either absolutely worthless or its use so inconvenient and imperfect that it must be presumed the buyer would not have purchased it had he known of the vice or defect. We note, however, that the defense of redhibitory device is inapplicable to an agreement to buy and sell. In Stack v. Irwin et al., 246 La. 777, 167 So.2d 363, the Supreme Court, relying upon Bornemann v. Richards, 245 La. 851, 161 So.2d 741, declared:
“The codal articles on redhibition deal specifically with sales. These provisions set forth special rules relating to error in the cause of completed sales. As we recently held, these articles do not apply to a contract to sell. However, if at the time of the present contract, the residence contained a latent defect of such a nature as to induce error relating to the known, principal cause of the contract, then it is a proper one for rescission.”
We find, however, that the rule announced in Stack, above, is dispositive of the case at hand. In Stack, above, plaintiff sought rescission of an agreement to purchase defendant’s residence on the ground that the structure contained latent defects of a serious nature. Plaintiff contended the house was defective in that its foundation had a crack in the cement slab, the walls and floors were cracked, water was seeping into the house, the bedroom floor was warping and the air conditioning system was faulty. Defendant reconvened praying for specific performance. The Supreme Court denied specific performance and avoided the contract to sell on the basis of LSA-C.C. art. 1825 which recites:
“The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; the principal cause is called the motive, and means that consideration without which the contract would not have been made.”
Stack, above, held that LSA-C.C. art. 1825 contemplates a defect in the thing to be sold that renders it so imperfect that the contract would not have been made had the true facts been known. Stack further noted that the purchaser’s principal motive in executing the contract to buy was to obtain a residence free from substantial defects. This motive was deemed to be known or presumed to have been known by vendor. In substance, the opinion in Stack, above, concluded that there was error relating to the principal cause of the contract sufficient to warrant rescission.
Present purchasers likewise seek to avoid a contract to buy and sell predicated upon a latent defect discovered in the foundation of the residence which was the principal cause of the agreement. The record discloses that the defects were substantial. In this respect, the testimony of Mr. Dod-well, who repaired the damage for Mr. Rubenstein, estimated the cost of repairing *498 all the discovered defects to be $2,478.00. The testimony of Mr. Couvillion indicates the damage noted was extensive, and that it perhaps affected the walls. Mr. Cashio found the damage such that he advised defendants not to purchase the property. We think that as in Stack, above, it is to be supposed that purchasers contemplated a residence free of substantial defects and vendors must be deemed to have been aware of this motive.
Vendors and Broker herein contend that the defects relied upon by Purchaser as ground for avoidance, were apparent and known to Purchaser in part, thereby imposing upon Purchaser the duty of making a thorough inspection of the residence. In so maintaining, owners and Broker rely principally upon Pursell v. Kelly, 244 La. 323, 152 So.2d 36, and Bonhagen v. Hooper, 195 So.2d 447.
Pursell and Bonhagen, above, both involved an action in redhibition. We deem these authorities pertinent only insofar as they delineate the duty of inspection incumbent upon a prospective buyer. We find that the same duty of inspection imposed upon a purchaser seeking to avoid a completed sale applies also to a party who signs an agreement to purchase and then discovers latent defects prior to consummation of the transfer. For this reason, the question to be resolved is whether or not the circumstances of this case were such as to impose upon purchasers the duty of inspection which would have revealed the subsequently discovered defects.
In Pursell, above, purchaser sought to annul the sale of a wooden two-story frame combination grocery and residence because of an alleged redhibitory defect consisting of extensive termite damage. It was shown that prior to the sale, the wall on one side of the structure was bowed and leaning, on two other sides the walls were leaning, the upstairs front room was sloped and shaky and had sunk. A pest control and termite expert testified that a superficial inspection was sufficient to reveal that the building was infested with termites. Under these circumstances, the Supreme Court held the termite damage was discoverable by a simple inspection of the premises. With regard to the duty and extent of inspection required in such cases, the Supreme Court observed:
“Inspection, as defined by Webster’s New International Dictionary, 2nd Ed., means a strict or prying examination. This connotes more than mere casual observation; it envisages an examination of the article by the vendee with a view of ascertaining its soundness. However, the Code limits the exclusion of warranty to those defects discoverable by a simple inspection. This, it is manifest, relieves the buyer of examining the inner or hidden parts of the object of the sale for the purpose of ascertaining the existence of latent defect.”
We likewise note that in Pursell, above, the Supreme Court established the following test for determining the availability of either the redhibitory action to annul a sale or the action in quanti minoris:
“The proper test to be applied to this case, we think, as in all other cases of this kind, is whether a reasonably prudent buyer acting under similar circumstances would have discovered the presence of termite damage in the premises.”
In Bonhagen, above, four termite companies inspected a house, the sale of which was subsequently sought to be set aside for a redhibitory defect. Two of the inspecting concerns were available at the time of trial. Agents of both concerns testified they informed the purchaser they detected slight damage but no structural defects, and that they also noted active subterranean termite infestation which required treatment. Following the sale, the purchaser found significant structural termite damage. In applying the test prescribed in Pur-sell, above, the court noted that the circumstances demanded greater prudence on the *499 part of the purchaser and refused to set the sale aside. In this regard, the court stated:
“ * * * we must conclude that plaintiff did not act with reasonable prudence under the circumstances. Having notice of some old damage and current infestation, he was under duty to make further inspection.”
It is elementary that in cases of this nature, the duty to inspect must be determined in the light of the circumstances of each individual case. Here, it is clear that purchasers were alerted to the fact that a defect existed in the floor of the residence. They observed the defect themselves. Moreover, the nature of the defect was such as to cause Mrs. McKnight strong misgivings about the underlying cause thereof to the extent she urged her husband to investigate, notwithstanding Eanes’ assurance the trouble was minor. Additionally, Mr. McKnight was advised by his friend, Doiron (an experienced contractor), to investigate the cause of the “bounce” which Doiron noted. It further appears that Mr. McKnight is experienced in the drafting of house plans and engaged in this type of work quite extensively. Under these circumstances, we think the trial court properly found that purchasers did not act as reasonably prudent buyers in failing to investigate further. Certainly, we cannot say the trier of fact was manifestly erroneous in this conclusion.
The purchase agreement provides in effect that as between Vendor and Purchaser, in the event of breach, either is liable to the other for all costs and fees incurred in enforcing collection and damages. It also provides that in the event of Purchaser’s default, Purchaser shall be liable for the Broker’s commission. The agreement is silent as to fees or expenses being collectible by the Broker. Purchaser’s default resulted in Vendor incurring expense in the sum of $1,234.80, consisting of $832.80 in additional mortgage payments, $300.00 additional interest, and $102.00 deposition costs. The trial court allowed recovery of these items, and an additional $2,000.00 as attorney’s fees. The several awards were aggregated by the trial court at $3,334.20, whereas the correct amount is $3,234.80. Appropriate amendment will be made in this respect.
The trial court declined to award Vendors $11,000.00 as damages sustained by virtue of the subsequent sale at a price of $11,000.00 below that agreed upon by purchasers. The lower court so held on the ground that Vendor could have obviated any loss whatsoever by demanding specific performance as expressly provided by the purchase agreement. In so holding, the trial court erred.
LSA-C.C. art. 1926 recites that upon breach of an obligation, the obligee “is entitled either to damages, or in cases which permit it, to a specific performance of the contract, at his option, or he may require the dissolution of the contract, and in all these cases damages may be given where they have accrued, according to the rules established in the following section.” (Emphasis by the Court.)
LSA-C.C. art. 1930 states that one who violates a contract is liable, as one of the incidents of his obligations, to the payment of damages which the other party has sustained by his default.
Also pertinent are the provisions of LSA-C.C. art. 2462 which expressly confer upon either party the performance of a contract to purchase. It follows that Vendors did not forfeit or waive their rights to damages because they failed to demand specific performance. Vendors clearly had the option to do either; they chose damages.
We note that in Womack v. Sternberg, 247 La. 566, 172 So.2d 683, the Supreme Court dealt in depth with the breach of an obligation to exchange real estate and mortgage paper valued at $75,000.00, for a residence of equal value. Sternberg, who was to exchange his home, valued at $35,-000.00, and first mortgages, valued at $40,- *500 000.00, defaulted on the agreement. In determining damages due, the court in Wo-mack, above, held that LSA-C.C. arts. 1926, 1930 and 1934 were applicable. The Court also noted that Article 1934, above, permits recovery only of contemplated damages where the offending party is not guilty of either fraud or bad faith. The Court, in Womack, next observed that with respect to a bad faith breach, the offending party is liable, not only for foreseen damages, but also those which are the “immediate and direct consequence of the breach * * The Court then cited numerous authorities which hold that damages for breach of an agreement to buy are measured by the difference between the contract price and the market value of the object of the contract as of the date of default. The Supreme Court held in Womack that the foregoing rules were applicable to the agreement of exchange, and remanded the cause to the trial court to determine market value of the respective properties as of the date of default. We are of the opinion that the ruling in Womack, above, is applicable to the case at hand.
Under the circumstances, Mrs. Eanes may not recover attorney’s fees from purchasers. It is settled law that attorney’s fees are recoverable only where specifically authorized by law or contract. Kiefer v. Bemie Dumas Buick Co., La.App., 210 So.2d 569.
Womack, above, impels our remand of this matter to the trial court for the purpose of determining the difference between the contract price and the market value of subject property as of October 19, 1968, and the assessment of such sum as additional damages due Vendors.
Considering further proceedings are necessary herein, we set aside the award of $2,000.00 attorney’s fees granted Vendors below. The trial court may reassess the amount of attorney’s fees due Vendors after completion of the proceedings on remand.
The judgment of the trial court awarding plaintiff Eanes judgment against defendants, Victor and Wanda S. McKnight, in the sum of $2,940.00, and denying said plaintiff’s demands for attorney’s fees, is affirmed. Judgment is hereby rendered in favor of plaintiffs, Luther S. and Joy L. Fortenberry, and against defendants, Victor and Wanda S. McKnight, in the sum of $1,234.80, for mortgage payments, interest and deposition, with legal interest thereon from date of judicial demand, until paid. The judgment awarding plaintiffs, Luther S. and Joy L. Fortenberry, attorney’s fees in the sum of $2,000.00 against defendants, Victor and Wanda S. McKnight, and rejecting said plaintiffs’ demands against said defendants for additional damages for breach of subject contract, is reversed and set aside, and this matter remanded to the trial court for further proceedings consistent with the views herein expressed. All costs of these proceedings to be paid by defendants, Victor McKnight and Wanda S. McKnight.
Affirmed in part, amended in part, reversed in part, and remanded.