649 So.2d 1059 (1995)
Chester AMEND, et ux, Plaintiffs-Appellees,
v.
John McCABE, et ux, Defendants-Appellants.
No. 94-332.
Court of Appeal of Louisiana, Third Circuit.
January 4, 1995.
Writ Granted March 30, 1995.
Harry Brenner Sadler, for Chester Amend et ux.
*1060 Gregory R. Aymond, for John McCabe et ux.
Before THIBODEAUX, COOKS and SAUNDERS, JJ.
SAUNDERS, Judge.
The trial court awarded damages for breach of contract to attempted sellers of termite infested residential property, finding that the apparent damages from the infestation were not so significant as to vitiate the cause of the buy-sell agreement.
We reverse, as the purchasers could not be held accountable for the property's unapparent defects, and the sellers did not make the necessary repairs contemplated by the agreement.

FACTS
By buy-sell agreement dated June 16, 1992, plaintiffs-appellees, Chester and Jean Amend entered into an agreement with defendants-appellants, John and Jacalyine McCabe, whereby the McCabes would acquire the Amends' property for $195,000.00 on July 16, 1992. Paragraph 7 of the buy-sell agreement stated:
I. Seller shall provide, at seller's expense, a wood destroying pest inspection report from a licensed pest control firm prior to closing.
A. All required extermination in said report shall be paid for by seller and completed prior to closing, unless otherwise agreed upon in writing by the parties.
II. If said report reveals structural damage caused by wood destroying pests, the seller shall have the option of
A. (1) completing the repairs,
B. (2) providing for their completion, or
C. (3) refusing to complete them.
1. If the seller elects to refuse to complete the repairs, the purchaser shall have the option of (1) accepting the property in its present condition (2) terminating the contract, in which latter case, the deposit shall be refunded in full.
III. The above mentioned options will control should all parties involved in the sale be unable to reach an acceptable compromise.
To comply with the terms of the buy-sell agreement, the vendors retained Mid-South Pest Control to conduct a termite inspection of the property before the closing date. Mid-South's "Wood Destroying Insect Report," dated July 2, 1992, indicated that its "house only" inspection revealed visible evidence of "active infestation" of native subterranean termites. Beyond the "readily accessible areas of the property" which were visually inspected, the report put its reader on notice that certain areas of the property inspected were obstructed or inaccessible, including by way of example the interior portions of walls. Although the inspection had been completed July 2, the McCabes were not informed of the dwelling's termite problem until shortly before the closing date.
After learning that the McCabes' interest in the property had vanished, the Amends contacted their agent, who suggested they contact an engineer to inspect for structural damages. Civil Engineer Richard M. Primeaux was selected for that purpose on July 15, but only on the condition that he inspect the property that day, which was the day before the closing was scheduled to occur. The engineer's inspection report stated:
"Interior inspection showed no structural damage to any components of the structure which could be seen without removing any wall or ceiling panels ...
The exterior inspection revealed no slab cracks or structural damage. One short board, near an exterior sliding door unit, had experienced minor termite damage and it is understood that the entire perimeter of the foundation has since been treated. No evidence of any other termite damage was observed."
Ultimately, the house was sold to another party, Wally Metrejean, who paid $185,000.00, $10,000.00 less than the original purchase price, about two months after the originally planned closing date. Metrejean, who had been advised of the termites prior to his purchase, indicated that his lower offer was *1061 in no way related to the Amends' alleged desperation of having to bear the expenses of two residences.
After a bench trial, the court rendered judgment in favor of plaintiffs-vendors. The court concluded that defendants breached their end of the buy-sell agreement, concluding that the termite infestation "did not constitute sufficient structural damage or cause to vitiate [the] contract...." The court awarded plaintiffs $10,000.00, the difference between the figure contemplated by the buy-sell agreement and $185,000.00 received two months later from Metrejean, plus closing costs associated with the Metrejean sale, two interim mortgage payments on the affected property, and miscellaneous expenses.
On appeal, the McCabes argue that Paragraph 7 of the buy-sell agreement called for the Amends to have their home checked for evidence of termites and structural damages. The McCabes complain that, by the termite inspectors' own admission, they could not verify the existence of no structural damages related to the termites due to the cursory nature of the two inspections which had been performed. Additionally, according to their interpretation, because termites were found, they had to be exterminated and the damages caused by them repaired. Because the repairs were not made, the McCabes suggest in brief that Paragraph 7 permitted them to walk away from the contract contending that they should not be required to buy a home with unrepaired termite damage and "a probability of further damage caused by those termites inside the walls."
The Amends, on the other hand, observe that termites are common in Louisiana, and point out that the tunnel of termites found on their home defaced only a small portion of a board about the size of a baseball or softball on the exterior of the home. The Amends further observe that neither the termite nor engineering report that spoke of termites observed any "structural damage"; therefore, they maintain that the McCabes cannot defend their refusal to purchase the property on the basis of the vendors' failure to repair any.

OPINION
We conclude that this sale failed for lack of fulfillment of a certain suspensive condition, the failure of the vendors' agents to adequately inspect the premises to ascertain that it possessed no structural deficiencies.
LSA-C.C. art. 2046 states:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
Also relevant are certain portions of LSA-C.C. arts. 1767 and 1773:
Art. 1767. A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.
* * * * * *
Art. 1773. If the condition is that an event shall occur within a fixed time and that time elapses without the occurrence of the event, the condition is considered to have failed.
The facts of this case are very similar to those of Thompson v. Johnson, 602 So.2d 272 (La.App.2d Cir.1992):
"The defendant testified that he intended to buy the plaintiffs' property until he learned of the termite damage. He said that, due to a previous bad experience with a termite-infested house, he was particularly sensitive to the termite problems with the plaintiffs' house. His understanding of the contract was that the termite problem invalidated his obligation to buy the house."
Id., at 273. The trial court in Thompson ruled in favor of the plaintiffs. Its judgment was reversed on appeal because the termite reports, so vital to the wary purchaser, were inadequate.
"A major requirement of one who seeks specific performance is proper performance of his part of the contract. In the absence of proper performance, plaintiffs must prove they are and were ready to comply with whatever obligations devolved upon them to perform. Carmadelle v. *1062 Koch-Ellis Marine Contractors, 420 So.2d 1029 (La.App. 5th Cir.1982), writ denied, 427 So.2d 869 (La.1983)
* * * * * *
"The importance of the certificate to the defendant [was] obvious. Having been made aware of the existence of some past termite damage, the defendant would have had no recourse against either the sellers or the inspector in the event that much more extensive damage was later discovered. Bonhagen v. Hooper, 195 So.2d 447 (La.App. 4th Cir.1967), writ refused, 250 La. 634, 197 So.2d 652 (1967).
"Consequently, we find that the trial court clearly erred in granting specific performance of the contract in favor of the plaintiffs. They were not entitled to this remedy because of their own failure to comply with the provisions of the contract. Nor do we find that the Thompsons are entitled to damages. The contract between the Thompsons and Mr. Johnson specifically provided that, in order to be binding, all of its terms and conditions had to be satisfied. Since the clear and unambiguous language of the contract required the Thompsons to supply the buyer with a `clear' termite certificate, and they failed to do so within the allotted time period, the contract was not binding upon the defendant."
Thompson, supra, at 274-275. See also, Caple v. Green, 545 So.2d 1222, 1226-1228 (La. App.2d Cir.1989) (vendor accountable for existing damage at time of sale which was not revealed to purchaser and not apparent).
Upon an obligor's failure to perform an obligation, the obligee is entitled to demand specific performance plus delay damages, although damages in lieu of specific performance may be allowed where specific performance is impracticable. LSA-C.C. art. 1986. In Thompson, the vendor sought specific performance which it was ultimately denied due to the vendor's failure to adequately inspect the property. Here, vendors' damages must be denied on the same ground. As in Thompson, the termite inspection reports were inadequate to fulfill the vendor's end of the bargain.
While it is true, as vendors maintain, that the inspectors retained by hired by them found no structural damage, it is equally true that neither could make such a determination.
At trial, Mid-South's pest inspector, Craig Bordelon, observed that because termites eat from the inside out, observations of termite damages from visual inspections frequently signify internal damages. Consequently, after treating the property, he could not indicate whether there was any structural damage to the interior of the walls: "without opening up a wall where the termites are found on the outside, you can't see what's inside the wall."[1]
Likewise, engineer Primeaux indicated that he was not made aware in advance of any termite damage and, had he known that the dispute concerning the house dealt with whether or not there was termites hidden in the walls, he would have recommended removing the rotted paneling to inspect. Additionally, the engineer's narrative inspection report contained the following disclaimer:
"This report of inspection does not constitute or infer any warranty by the undersigned; but, intends to verify the structural condition of the residence from a visual inspection."
The following exchange occurred between the engineer and counsel for the McCabes' on redirect:
Q All right. Let me ask you this. Hearing what you've heard today that Mr. McCabe may have had a question about whether or not there was any further damage totermite damage hidden within the walls of this home, your report doesn't answer that question, does it?
A No, it doesn't.
Q And, in fact, you say you will not warranty any hidden damage because you didn't look for it, did you?
A Right. All I canthis is a standard paragraph I include. I did look in the attic and the whole interior and perimeter, just *1063 a visual. We didn't do any destructive inspection.
Q Certainly. So that would not answer his question about whether or not there were any more areas of damage hidden within the walls of this house?
A No, it wouldn't.
Q Thank you very much.
We do not agree with the proposition raised by the vendors that because the inspection reports filed by contractors they retained found no structural damages, that the McCabes somehow become liable for the exposure to such defects, for it was the vendors, not the purchasers, who were to provide, at their expense, an inspection that would cover not only termites, but structural damages arising from their activities. The seller is bound to explain himself clearly respecting the extent of his obligations, and any obscure or ambiguous clause is construed against him. LSA-C.C. art. 2474. See also LSA-C.C. art. 2057. Therefore, we cannot accept plaintiffs' proposition, that the purchasers may be held liable for the vendors' failure to have the repairs made to the house. A suspensive condition that depends solely on the whim of the obligor makes the obligation null. LSA-C.C. art. 1770.

CONCLUSION
By the contract's clear terms, the vendors were required to adequately inspect the premises and make any necessary structural repairs, and the vendors failure to do so in this case cannot be construed to inure to the vendors' benefit.
Because the sale in this case fails for lack of fulfillment of a suspensive condition, we need not consider whether the house contained a redhibitory vice warranting avoidance or reduction. Compare, e.g., Payne v. O'Quinn, 565 So.2d 1049 (La.App. 3d Cir. 1990). The judgment of the trial court is reversed, with costs assessed to plaintiffs-appellants.
REVERSED AND RENDERED.
NOTES
[1] Bordelon further indicated that if it was him buying the house, he would want to know more about the possibility of such hidden damages before following through with the sale.