664 So.2d 1183 (1995)
Chester AMEND, et ux,
v.
John McCABE, et ux.
No. 95-C-0316.
Supreme Court of Louisiana.
December 1, 1995.
*1184 Gregory R. Aymond, for Applicant.
H. Brenner Sadler, Raymond B. Landry, Provosty, Sadler & DeLaunay, for Respondent.

ON REHEARING
VICTORY, Justice.[1]
We granted the defendants' rehearing application to determine if the sellers had a contractual obligation to inspect their home for hidden termite damage after a pest inspection report required by the buy-sell agreement revealed active termite infestation. We find that the contract did not require the sellers to inspect the home for structural termite damage, and that the sellers are entitled to damages for the buyers' refusal to purchase the home.

FACTS & PROCEDURAL HISTORY
Following negotiations, Chester and Jean Amend agreed to sell their home to John and Jacalyn McCabe for a price of $195,000.00. The parties expressed the terms of their agreement through a "Contract to Buy and Sell," dated June 16, 1992. Paragraph 7 of the buy-sell agreement provided:

Seller shall provide, at seller's expense, a wood destroying pest inspection report from a licensed pest control firm prior to closing. All required extermination in said report shall be paid for by seller and completed prior to closing, unless otherwise agreed upon in writing by the parties. If said report reveals structural damage caused by wood destroying pests, the seller shall have the option of (1) completing the repairs, (2) providing for their completion, or (3) refusing to complete them. If the seller elects to refuse to complete the repairs, the purchaser shall have the option of (1) accepting the property in its present condition (2) terminating the contract, in which latter case, the deposit shall be refunded in full. The above mentioned options will control should all parties involved in the sale be unable to reach an acceptable compromise. (Emphasis added.)
Pursuant to this provision, the Amends hired Mid-South Pest Control, Inc., to perform the inspection, which was conducted on July 2, 1992, by its employee, Craig Bordelon. As is customary, Bordelon inspected only the accessible and unobstructed areas of the home. He discovered that a lower exterior board had sustained a softball sized area of termite damage.[2] He also found that the home was actively infested with termites, and indicated this finding in Item 9 of the Wood Destroying Insect Report, which stated: "BASED ON CAREFUL VISUAL INSPECTION OF THE READILY ACCESSIBLE AREAS OF THE PROPERTY (See Item 12A before completing.), C. Visible evidence of active infestation of Native Subterranean *1185 Termites was found. Proper control measures were performed."
The report, a pre-printed form adopted and approved by the Louisiana Structural Pest Control Commission and the Louisiana Pest Control Association,[3] contained numerous disclaimers of responsibility for inspecting hidden or inaccessible areas. The first was set forth in the following paragraphs, positioned at the top of the one page form:
A qualified inspector employed by this company has carefully inspected all accessible areas of the property located at the address below for termites and other wood destroying insects. This disclosure specifically excludes hidden and/or inaccessible areas of damage and the pest control company assumes no legal responsibility for repairs to such damaged areas.
WARNING: THE INSPECTION DESCRIBED HEREIN HAS BEEN MADE ON THE BASIS OF VISIBLE EVIDENCE IN READILY ACCESSIBLE AREAS AND THIS REPORT IS SUBMITTED WITHOUT WARRANTY, GUARANTEE OR REPRESENTATION AS TO CONCEALED EVIDENCE OF INFESTATION OR DAMAGE OR AS TO FUTURE INFESTATION. (Bold and caps in original.)
The "FINDINGS" section of the report also contained several warnings and/or notices which unequivocally revealed that only the accessible areas of the home had been inspected. Particularly, Item 6 of the report read:
6. WERE ANY AREAS OF THE PROPERTY OBSTRUCTED OR
INACCESSIBLE?
 [×] Yes [] No
 (If "Yes" see Items 7 & 8).
Item 7 inquired as to the type of construction of the home, to which Bordelon responded "monolithic slab." Item 8 consisted of a warning listing a litany of common obstructions and/or inaccessible areas which were not inspected.[4]
Finally, Item 12, entitled STATEMENT OF PEST CONTROL OPERATOR, provided, in pertinent part:
A. The inspection covered the readily visually accessible areas of the property only. Attention was given to those visually accessible areas which have been shown to be particularly susceptible to attack by wood destroying insects. Probing and/or sounding of visually infested and/or damaged wood members was performed.

*1186 B. The inspection did not include areas which were obstructed or inaccessible at the time of inspection.

C. This is not a structural damage report. (Emphasis added.)
On July 2, the same day that the inspection was performed, the Amends had the termites exterminated as required by paragraph 7 of the buy-sell agreement. The treatment costs totalled $600.00.
The McCabes were not informed of the results of the inspection and extermination until two days before the closing, which was scheduled for July 16, 1992. Upon learning about the inspection report, the McCabes indicated they no longer desired to purchase the home due to prior difficulties that they had encountered in selling a termite damaged home. The McCabes informed Kathy Gawthorp, the selling real estate agent with Noles-Frye Realty, that they did not intend to go through with the sale. In turn, she notified Nat Marks, the listing agent with Noles-Frye Realty, of the McCabes' decision not to buy the home.
After becoming aware that the McCabes no longer intended to consummate the sale, the Amends conferred with Ms. Marks, who suggested that the McCabes' fears might be placated if a civil engineer inspected the home. On July 15, 1992 one day before the scheduled closing), the Amends hired Richard M. Primeaux, civil engineer, to inspect the property for structural damage. However, Primeaux testified that he was unaware that he was hired to inspect the home to insure that there was no structural damage from termites. He assumed that he was retained to examine the home for ordinary structural defects caused by soil and foundation problems, and conducted the inspection for this purpose. Primeaux stated that if he had known that there were concerns about structural termite damage he would have recommended a more thorough inspection (e.g., removing paneling from walls). Primeaux reported:
Interior inspection showed no structural damage to any components of the structure which could be seen without removing any wall or ceiling panels. The attic inspection showed all factory trusses properly braced with no sagging or splits. All interior doors, window openings, skylights, and walls were checked and found to be in good structural condition with no evidence of any structural problems.
The exterior inspection revealed no slab cracks or structural damage. One short board, near an exterior sliding door unit, had experienced minor termite damage and it is understood that the entire perimeter of the foundation has since been treated. No evidence of any other termite damage was observed.
This house is considered to be in excellent structural condition with no problems noted.

This report of inspection does not constitute or infer any warranty by the undersigned; but, intends to verify the structural condition of the residence from a visual inspection. (Emphasis added.)
Despite the sellers' efforts, the McCabes refused to purchase the property, expressing concerns about possible hidden damage which would not have been revealed by Primeaux's "visual inspection." Approximately two months later, the Amends sold the home to another purchaser, Wally Metrejean, for $185,000.00.
On November 10, 1992, the Amends filed suit against the McCabes for breach of contract and damages. The McCabes reconvened, claiming that the Amends failed to comply with paragraph 7 of the buy-sell agreement which required them to evaluate whether the home had been structurally damaged by the termites. As such, the McCabes argued that they were entitled to have their $1,000.00 deposit refunded.
Following a bench trial, the trial court ruled against the McCabes, finding that the termite infestation, "did not constitute sufficient structural damage or cause to vitiate the contract." The trial court awarded the Amends $10,000.00 in damages, representing the difference between the original $195,000.00 purchase price agreed to by the McCabes, and the $185,000.00 purchase price ultimately paid by Metrejean. The trial court also awarded the Amends $2,500.00 in closing costs associated with the Metrejean *1187 sale; $1,718.72 representing two interim mortgage payments made after the McCabes refused to close; and $250.00 representing two extra monthly insurance payments and property tax payments that the Amends were required to pay after the McCabes refused to close.
The defendants appealed, and the Louisiana Third Circuit Court of Appeal reversed the trial court's decision. Amend v. McCabe, 94-332 (La.App. 3d Cir. 1/4/95); 649 So.2d 1059. The court of appeal concluded that the sale failed for lack of fulfillment of a suspensive condition, interpreting paragraph 7 of the buy-sell agreement as requiring the sellers to inspect the home for termite infestation and structural damage caused thereby. According to the court of appeal, the inspection reports from Bordelon and Primeaux did not fulfill the sellers' end of the bargain because both disclaimed structural damage.
On March 30, 1995, this Court summarily granted the Amends' writ application, and reversed the court of appeal. Amend v. McCabe, 95-0316 (La. 3/30/95); 652 So.2d 1298. We found that the buy-sell agreement, and the usage of practice regularly observed in residential real estate transactions, did not require the Amends to obtain anything other than a report from a licensed pest control firm based upon a visual inspection. We concluded that the Amends complied with the terms of the buy-sell agreement, and that the McCabes' failure to purchase the home was unjustified.
From this adverse ruling, the McCabes applied for rehearing. We granted the rehearing to reexamine whether the sellers had a contractual obligation to inspect the home for hidden termite damage. Amend v. McCabe, 95-0316 (La. 6/2/95); 654 So.2d 1096.

INTERPRETATION OF CONTRACTS
In interpreting contracts, we are guided by the general rules contained in articles 2045-2057 of the Louisiana Civil Code. The cardinal rule is set forth in La.Civ.Code art. 2045, which states that the interpretation of a contract is the determination of the common intent of the parties.
To determine the parties' intent, courts must first look to the words and provisions of the contract. When they are clear and explicit, no further interpretation may be made in search of the parties' intent. La. Civ.Code art. 2046. Stated differently, when the language of the contract is unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. La.Civ.Code art. 2046, comment (b); Cashio v. Shoriak, 481 So.2d 1013, 1015 (La. 1986), citing Maloney v. Oak Builders, 256 La. 85, 235 So.2d 386 (1970). Notwithstanding, Article 2046 establishes an exception to this rule. Even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Cashio, supra, citing Texaco v. Vermilion Parish School Board, 244 La. 408, 152 So.2d 541 (1963), and National Roofing and Siding Co. v. Giaise, 434 So.2d 85 (La.App. 5th Cir. 1982), writ denied, 435 So.2d 443 (La.1983).
To determine the meaning of words used in a contract, courts should give them their generally prevailing meaning. However, words of art and technical terms must be given their technical meaning when the contract involves a technical matter. La.Civ. Code art. 2047; Schroeder v. Board of Supervisors, 591 So.2d 342, 345 (La.1991) (citations omitted). If a word is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the object of the contract. La.Civ.Code art. 2048.
A contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. La.Civ.Code art. 2049; John Bailey Contractor, Inc. v. State, Through the Department of Transportation and Development, 439 So.2d 1055, 1058 (La.1983) (citations omitted) ("Courts will not impute to the parties the use of language without meaning or effect."). Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. Civ.Code art. 2050. Doubtful provisions must be interpreted in light of the nature of *1188 the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La.Civ. Code art. 2053; John Bailey Contractor, Inc., supra. "Equity" is based on the principle that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. "Usage" is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation. La.Civ.Code art. 2055.

DISCUSSION

Termite Provisions: Contractual Terms to Avoid Redhibition Consequences
Generally, the seller of a home impliedly warrants to the buyer that it is free from redhibitory vices or defects. La.Civ. Code art. 2475-2476.[5] A redhibitory vice or defect, which entitles the buyer to rescind the sale or reduce the price, is one that renders the home either absolutely useless or makes its use so inconvenient that it must be supposed that the buyer would not have purchased the home if he had known of the vice. La.Civ.Code art. 2520, 2541.[6]
Not all redhibitory vices or defects justify rescission of the sale or reduction of the price. Apparent defects, which the buyer can discover through a simple inspection, are excluded from the seller's legal warranty. La.Civ.Code art. 2521. To determine whether the defect is apparent, one must consider whether a reasonably prudent buyer, acting under similar circumstances, would discover it through a simple inspection of the property. A simple inspection is more than a casual observation; it is an examination of the article by the buyer with a view of ascertaining its soundness. Pursell v. Kelly, 244 La. 323, 152 So.2d 36, 41 (1963).
Whether termite damage should be apparent to the buyer of a home is a question of fact. Typically, when all of the termite damage is concealed within the home's structure (e.g., walls and floors) it is considered unapparent because it is not discoverable by a simple inspection. Pursell, supra, (discussing, with approval, Ruehmkorf v. McCartney, 121 So.2d 757 (La.App. 2d Cir.1960), and Foreman v. Jordan, 131 So.2d 796 (La.App. 3d Cir.1961)). See e.g., Abdelbaki v. University Presbyterian Church, 380 So.2d 35, 37 (La.1980); Fraser v. Ameling, 277 So.2d 633, 638 (La.1973). In such situations, there is no obligation on the part of the buyer to inspect further. Fraser, supra; Pursell, supra. On the other hand, when some of the termite damage is detectable by a simple inspection, the buyer has a duty to investigate further. If he chooses to purchase the home without further investigation, he waives the right to sue for redhibition or reduction based upon the termite damage. See, e.g., Pursell, supra; Ingraffia v. Coleman, 467 So.2d 616 (La.App. 3d Cir.1985); Bonhagen v. Hooper, 195 So.2d 447 (La.App. 4th Cir.1967), writ denied, 250 La. 634, 197 So.2d 652 (1967).
Thus, in redhibition or reduction actions based on the buyer's discovery of termite damage after the purchase of a home, the case often turns on whether the infestation or damage was partially apparent, and should have been noticed by the buyer during the simple inspection. This is a fact intensive inquiry which produces varying and unpredictable results from case to case. To avoid litigation under these legal standards, *1189 buyers and sellers routinely contract for the seller to produce, at his expense, a termite certificate showing that the home has been visually inspected in readily accessible areas, and that the extermination of any active termite infestation has been accomplished.[7]
Such termite provisions are designed to protect both parties. By requiring a professional inspection the buyer satisfies his obligation to conduct a simple inspection, intending to avoid purchasing a home with active infestation and/or visible termite damage. At the same time, the seller's fears of being sued later for redhibition or reduction are alleviated. Since the inspection puts the buyer on notice of infestation and visible damage discoverable by simple inspection, he has no cause to complain about them in subsequent litigation. La.Civ.Code art. 2522.[8]
Nevertheless, as in this case, if a routine termite inspection reveals active infestation of termites or evidence of termite damage in a readily accessible area, the parties still may not know if there is more extensive hidden damage to the structure of the home. Thus, the primary issue presented in this case is whether the parties agreed that under these circumstances, the seller was obligated to inspect the home for structural damage caused by termites.
The court of appeal gleaned such an obligation from paragraph 7 of the buy-sell agreement. Thus, we examine the language of the contract to determine whether the parties intended for the Amends to be contractually bound to inspect the home for structural termite damage if the customary visual pest inspection of readily accessible areas revealed damage.

Intent of the Parties
It is clear from the first sentence of paragraph 7, and neither party disputes, that the sellers were obligated to, obtained, and produced a "Wood Destroying Insect Report." Because the report showed active infestation of termites which required extermination, sentence two became operative. It is undisputed that the Amends complied with the obligations prescribed by sentence two by paying $600.00 for an extermination prior to the closing date.
Thus, the heart of this dispute rests on the parties' intent in using the language contained in the remainder of paragraph 7, namely the third sentence. The court of appeal held that implicit in this language was a requirement for the sellers to, "provide at their expense, an inspection that would cover not only termites, but structural damage arising from their activities." We disagree.
A literal reading of sentence three which begins by stating, "If said report reveals structural damage caused by wood destroying pests," suggests only that the parties contemplated that the pest inspection report might reveal not only infestation, but structural damage.[9] However, sentence three does not create a separate duty to inspect for structural damage. It would have been very simple for the parties to explicitly provide for the seller to produce a structural damage report, but they did not do so. Rather, construing paragraph 7 as a whole, as we are required to do under La.Civ.Code art. 2050, the third sentence merely provides options *1190 for the seller and buyer in the event that structural damage is discovered during the ordinary and customary visual pest inspection. Here, of course, no structural damage was discovered, and as we now know, apparently did not exist.
Doubtful provisions of a contract should be interpreted in light of "usage," which is the practice regularly observed in affairs of a nature identical to the object of the contract subject to interpretation. La. Civ.Code arts. 2053, 2055. Bordelon testified that homes are not ordinarily inspected for damage to the infrastructure. He stated that it is general practice to inspect only the visible areas of the home, and that the inspection report used was a standard industry form purchased from the Department of Agriculture.
As the practice regularly observed in the pest inspection industry is to visually inspect only the readily accessible areas of a home, we conclude that this interpretation of the contract is reasonable, in light of usage.
Accordingly, we find that the parties intended for the Amends to obtain the customary pest inspection, and no more. Although the Amends attempted to obtain a structural inspection of the home in an effort to save the sale, the buy-sell agreement did not obligate them to do so. The McCabes' concerns that the home might have structural damage from termites did not give them the right to simply breach the contract that they entered into with the sellers.[10] The McCabes had the right to conduct a more thorough inspection to determine if the damage caused by the termites extended beyond the exterior damage to the interior components of the home. However, they chose not to conduct such an inspection, and breached the buy-sell agreement by refusing to purchase the home.

DAMAGES
The McCabes point out that they are entitled to a $1,000.00 credit against the damages awarded to the Amends.[11] We agree.
Paragraph 6 of the buy-sell agreement provides, in pertinent part:
In the event the purchaser defaults, seller shall have the right to declare the deposit ipso facto, forfeited, without formality beyond tender of title to purchaser; or seller may demand specific performance and/or damages, at seller's option. (Emphasis added.)
The Amends opted to sue for damages, and the McCabes are entitled, as the trial judge and both attorneys appeared to agree at the time of the judge's ruling, to a $1,000.00 credit against the damages awarded. However, the judgment contained in the record inadvertently failed to recognize the $1,000.00 credit. Thus, we amend the trial court's judgment to so provide.

DECREE
For the reasons stated, we affirm our judgment on original hearing insofar as it held that the Amends were not required to obtain an inspection for structural damage, and we amend our judgment on original hearing to award the Amends $14,468.72, less the $1,000.00 deposit previously paid by the McCabes.
AS AMENDED, JUDGMENT ON ORIGINAL HEARING AFFIRMED.
LEMMON, J., concurs and assigns reasons.
DOUCET, J., concurs for the reasons assigned by LEMMON, J.
JOHNSON, J., concurs in result.
LEMMON, Justice, concurring.
I disagree with the majority's narrow construction of the term "structural damage caused by wood destroying pests" in the buy-sell agreement. I would construe the "doubtful provision" (as characterized by the majority) against the obligee to encompass the type of visible damage, caused by active infestation, that was found on a lower exterior board. In my view, the parties contemplated *1191 that a report of such damage and active infestation made the next move up to the seller, who was the party responsible for the problem.
Because the report revealed visible termite damage to at least some small part of the structure of the house, the seller had the option (and the obligation) to repair (or to pay for the repair of) the damage, in default of which the buyer could opt out of the contract.[1] However, when the buyer learned of active termite infestation, he immediately refused to go through with the sale under any circumstances, thereby depriving the seller of his contractual options. The buyer thus breached the contract.
I therefore agree with the ultimate result reached by the majority.
NOTES
[1] Judge, Ned Doucet, Jr., Court of Appeal, Third Circuit, participating as Associate Justice Pro Tempore, in place of former Justice James L. Dennis. Watson, J., recused. Calogero, J., not on panel. Rule IV, Part 2, § 3.
[2] The subsequent purchaser of the home repaired the damage for approximately $50.00 to $60.00.
[3] Louisiana R.S. 3:3370(C), which is part of the Structural Pest Control Law, La.R.S. 3:3361 et seq., requires an inspector to issue reports on forms approved by the Structural Pest Control Commission. The statute provides:

Each person who holds a place of business permit and who issues a report on the presence of wood destroying insects, which is customarily referred to as a "wood destroying insect report", shall issue the report in writing and in a form which has been approved by the commission.
[4] These areas included:

A. JOISTS HIDDEN (a) suspended ceiling (b) fixed ceiling (c) insulation (d) floor over joists;
B. WALL COVERINGS (a) paneling (b) dry wall (c) plaster (d) tile (e) cabinets (f) shelving (g) wallpaper (h) bath trap;
C. FLOOR COVERINGS (a) tile (b) carpet (c) rugs (d) linoleum (e) built-ins;
D. PERSONAL POSSESSIONS (a) stored material (b) boxes (c) pictures (d) clothing (e) furniture (f) appliances;
E. ROOF RAFTERS HIDDEN (a) suspended ceiling (b) fixed ceiling (c) insulation;
F. RAISED FLOORING (a) flooring elevated with sleepers beneath;
G. EXTERIOR (a) dense shrubbery (b) siding (c) window well covers (d) planters;
H. PORCH (a) no access or entry beneath floor surface (b) debris;
I. ADD'L ITEMS (a) standing water (b) debris (c) firewood (d) no access or entry (e) absence of safe or stable access (f) attic (g) leaking roof (h) faulty plumbing (i) earth-wood contact (j) wooden decks (k) hidden expansion joints.
[5] Title VII, "Of Sale", containing articles 2438 to 2659, of Book III of the Civil Code was amended and reenacted by Acts 1993, No. 841, § 1, effective January 1, 1995. Because the rights and obligations of these parties were defined in 1992, when the buy-sell agreement was entered into, we apply the sales articles in effect at that time.
[6] Although the principles of redhibition do not apply to contracts to buy and sell, Stack v. Irwin, 246 La. 777, 167 So.2d 363 (1964), and Bornemann v. Richards, 245 La. 851, 161 So.2d 741 (1964), they are relevant in order to gain a clear understanding of what the parties intended to accomplish by requiring a termite inspection before the actual sale occurred. See Eanes v. McKnight, 251 So.2d 491, 498 (La. 1st Cir.1971), affirmed on other issues, 262 La. 915, 265 So.2d 220 (1972), wherein the court of appeal concluded that "... the same duty of inspection imposed upon a purchaser seeking to avoid a completed sale applies also to a party who signs an agreement to purchase and then discovers latent defects prior to consummation of the transfer."
[7] Such contracts are enforceable, since the codal articles on redhibition and reduction merely regulate the rights of the seller and purchaser in the absence of agreements to the contrary. Cf. La. Civ.Code 2503; McEachern v. Plauche Lumber & Construction Co., 220 La. 696, 57 So.2d 405, 407 (1952); Primeaux v. Bennett Homes, Inc., 339 So.2d 1251, 1254 (La.App. 1st Cir.1976) ("The codal articles on redhibition, reduction in price and avoidance of a sale, do not proscribe agreements modifying their provisions, they merely regulate the rights of purchaser and vendor in the absence of agreement contrary to their terms."). See also Hatten v. Estes Cadillac, Inc., 625 F.Supp. 913, 918 (E.D.La.1986).
[8] Louisiana Civ.Code art. 2522 provides:

The buyer can not institute the redhibitory action, on account of the latent defects which the seller has declared to him before or at the time of the sale. Testimonial proof of this declaration may be received.
[9] By structural damage, we mean damage to the structural integrity of the home, not merely superficial damage to non-load bearing parts of the home. Otherwise, the word "structural" would have no meaning in the contract and could have been omitted all together. Further, Primeaux and Bordelon testified to this definition of structural, and the inspection report specifically stated it was not a structural damage report.
[10] Dr. McCabe testified that after he received the termite inspection report, he would not have purchased the home under any circumstances.
[11] We have examined the McCabes' contentions concerning the trial court's award of damages, and find no error.
[1] The seller had the further option to refuse to repair the damage, whereupon the buyer could accept the property in the damaged condition or withdraw from the contract without penalty.