United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 16, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-30833
_____

JULIA B. JESSUP

            Plaintiff - Appellant

    v.

WALTER H. KETCHINGS

            Defendant - Appellee

_____

Appeal from the United States District Court
for the Eastern District of Louisiana, New Orleans
No. 2:04-CV-1069
_____

Before JONES, Chief Judge, and REAVLEY and PRADO, Circuit Judges.

PRADO, Circuit Judge:

    Plaintiff-Appellant Julia B. Jessup ("Jessup") purchased a triplex in the French Quarter from Defendant-Appellee Walter H. Ketchings ("Ketchings") and later discovered extensive damage to the property, including termite damage and water damage from a broken roof drain pipe. Jessup brought an action under Louisiana law against Ketchings seeking a reduction in the purchase price due to these redhibitory defects.

    Exercising diversity jurisdiction under 28 U.S.C. § 1332, the district court granted summary judgment in favor of Ketchings

-1-

on Jessup's claims.  Jessup now appeals.  For the reasons that follow, we AFFIRM in part and REVERSE and REMAND in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of the sale of a multi-story triplex consisting of three residential apartments, units 510A, 510B, and 512, located in the French Quarter of New Orleans, Louisiana.  In 2002, Ketchings listed the property for $495,000.  The property, portions of which were over 100 years old, was listed in "mint," "pristine," and "perfect" condition.  The Property Disclosure Addendum ("Disclosure Addendum"), signed by Ketchings on October 30, 2002, stated that the "[s]eller[] elect[s] to sell property 'As is' with full waiver of redhibition rights in act of sale . . . ."  On the Disclosure Addendum, Ketchings checked "yes" in response to whether the property had "ever had termites or other wood destroying organisms."

Jessup visited the property on one occasion.  Thereafter, she negotiated a contract with Ketchings to purchase the property, reserving the right to have various inspections performed.  On December 5, 2002, she signed an "Agreement to Purchase or Sell," offering to purchase the triplex for $475,000.  She also signed the Disclosure Addendum, acknowledging that she had read the seller's disclosures.

After further negotiations, on December 13, 2002, the parties executed a second "Agreement to Purchase or Sell," in

-2-

which Jessup agreed to purchase the triplex for $465,000. An addendum to the second agreement explained that the purchase price had been reduced for replacement of the roof on the main building of the triplex and that Jessup had ten working days to complete her property inspections.

Jessup obtained several reports on the condition of the property. On December 18, 2002, Edwin Gary Wehlen ("Wehlen"), the co-owner of E&G Pest Control, Inc. ("E&G"), inspected the property and prepared a termite inspection report for Jessup. The E&G report noted that it was "made on the basis of what was visible and accessible at the time of the inspection" and cautioned that "[i]f visible evidence of active or previous infestation of listed wood destroying insects is reported/indicated on graph, it should be assumed that some degree of damage is present, visible or not." The report had a check mark next to the statement "[g]et termite history on the home from whomever has the termite contract. This is your responsibility as a purchaser."

In the E&G report, Wehlen commented that "sub-flooring 2nd floor termite damaged and broken tiles, Recommended exposing this area for further termite damages." Wehlen later explained in an affidavit that his handwritten statement on sub-floor and tile damage was limited to the kitchen of unit 512.

On December 18, 2002, Jessup also received a property inspection report from consulting engineer Michael K.A. Gurtler

-3-

of Gurtler Brothers Consultants, Inc. ("Gurtler report").  The Gurtler report cautioned that it "can only include visible elements and conditions and does not purport to cover inaccessible areas or hidden damage.  It is not intended to replace, supersede or include the contents of a formal disclosure statement and we highly recommend that such a disclosure statement be obtained."  The report also noted that Mr. B Services had the contract for the control of termites on the property, and advised that Jessup should contact them to determine the history of termite treatment and any previous infestation of the house.

The Gurtler report identified problems with the following areas:

> Termite damages, identified by E&G Pest Control in their report dated 12/18/02, were noted to the left front corner of the apartment 510A living room, the wood base at the stairs of apartment 510B, the left front corner of the ceiling in apartment 510B bath, the flooring in apartment 510B bath near the closet and the walls and floors of apartment 512 of the utility area and kitchen.

It recommended that the damage to the walls in the living room of unit 510A "be further investigated by removing the effected [sic] sheetrock and checking the condition of the wood framing behind the sheetrock."  It also mentioned damages to the wood and ceramic floors in unit 510B, noting that the ceramic floors are cracked and uneven and that damage may exist to the framing below the ceramic and the framing above the ceiling materials.  With respect to these problems, the report suggested that "[f]loors

-4-

and ceilings should be opened and repaired as necessary." Finally, the report noted that "[d]amages to the wood floor in apartment 512 at the front of the refrigerator in the kitchen appear substantial" and that "[t]he ceramic floors are also cracked and uneven." It warned that "[d]amages may exist to the framing below the ceramic and the framing. Floors should be opened and repaired as necessary."

In the description next to unit 512 (which is located on the upper levels of the triplex), the Gurtler report stated that "[t]he stairwell plaster is considerably moisture deteriorated. This may be caused by leakage of the parapet walls above or by water 'wicking' or rising from the ground below through the load-bearing brick walls." The report noted moisture damage in unit 510B on the ceilings of the rear bedroom and bathroom, as well as on the right wall of the breakfast room. The report also explained that "much of the plumbing system is underground or behind the walls and is therefore not visible for inspection."

On December 26, 2002, Jessup submitted to Ketchings a Property Condition Clause Response, which identified the problems disclosed by the E&G and Gurtler reports, and asked Ketchings to comply with an addendum prepared by Dorian M. Bennett, Inc. ("Bennett Addendum"). The Bennett Addendum stated in relevant part:

>  -Apt. 510A, further investigate damages to walls as recommended. Have interior inspected by Gurtler Bros. and E&G Pest control when wall is opened, and repaired

-5-

and/or treated as per their specifications.

-Apt. 510B, further investigate damage to wood floors, have inspected by Gurtler Bros. and E&G when opened, and repaired and/or treated as per their specifications.

-Apt. 512, further investigate damages to the wood floor in kitchen, have inspected by Gurtler Bros. and E&G when opened, and repaired and/or treated as per their specifications.

Ketchings did not want to comply with the Bennett Addendum; instead, he initially offered to reduce the purchase price of the triplex by an additional $10,000. On January 10, 2003, the parties agreed that Ketchings would not be responsible for the work identified in the Bennett Addendum. In exchange, the parties negotiated that Jessup would be credited $12,000 toward the purchase price.

On January 22, 2003, Mr. B Services, the company that had performed termite extermination on the property since May 13, 1991, and that had a termite contract on the property through October 30, 2003, provided Jessup with a Wood Destroying Insect Report ("WDIR"). The WDIR had a check mark next to the box stating "[v]isible evidence of wood destroying insects was observed," and noted, in the space provided for "[e]vidence found and its location" that "scaring [sic] on stud in closet of 512 unit upstairs common wall." The report also stated that "[v]isible evidence of damage due to sub termites has been observed in the following areas[:] studs in closet of 512 unit upstairs common wall front corner." The WDIR cautioned that

"[i]f there is any evidence of wood destroying insects in the structure(s) inspected, it must be assumed that there is some damage." The terms and conditions section of the WDIR further warned that

> [i]f there is evidence of active infestation or past infestation of termites and/or other wood destroying insects it must be assumed that there is some damage to the building caused by this infestation, even if the damage is not visible to the inspector as of the date of the inspection.

Jessup signed the WDIR, indicating she had received an original copy.

On January 31, 2003, the parties executed the Act of Sale. The Act of Sale reflected a final purchase price of $451,912.50. It did not include the waiver of redhibition language contained in the Disclosure Addendum.

After taking possession of the property, Jessup discovered extensive damage which she claims was not disclosed during her inspections. Jessup found termite damage in units 512 and 510A to certain floors, walls, windows, and ceilings.[1] Jessup also discovered a broken roof drain pipe located in the wall of unit 510B, resulting in water leaking into and under that unit. The broken roof drain pipe resulted in damage to the foundation of the property and in erosion of soils under unit 510B and the

---

[1] Jessup alleges that she discovered the termite damage after she was exercising in unit 512 and noticed that the floor felt soft. Jessup claims that she discovered the extent of the damage after she had the contractor open up the floors.

sidewalk and porch of the property.[2]

On January 30, 2004, Jessup brought an action in Louisiana state court against Ketchings to recover for the redhibitory defects, seeking *quanti minoris* damages for a reduction in the purchase price of the property based on the termite and broken roof drain pipe damage. Ketchings removed the case to federal court based on diversity jurisdiction under 28 U.S.C. § 1332. Thereafter, both parties filed motions for summary judgment.

On February 18, 2005, the district court granted summary judgment in favor of Ketchings on both of Jessup's claims. The district court held that Jessup could not recover for the termite damage to the property because the E&G report placed Jessup on notice of termite damage and the presence of active termites, and that such notice required Jessup to further investigate the extent of the damage. The court also held that Jessup could not recover for the water damage to the property resulting from the broken roof drain pipe because her complaint did not state a claim for the defect.

On February 24, 2005, Jessup filed a motion for a new trial.

_____

[2] Jessup claims that she learned of the broken roof drain pipe when the tenant in unit 510B advised her that water was coming into the unit every time it rained. According to Jessup's deposition, the extent of the damage was not discovered until a video was sent through the pipe, revealing stoppage and breakage in the drain about four feet off the floor in unit 510B. During excavation of the property to install an elevator in the front of the building, Jessup's contractor found that the line was crushed and was dumping water under the sidewalk and the building.

Jessup argued that the district court erred in finding that the E&G report contained evidence of live termite activity because the E&G report actually indicated that there were no active termites. Jessup also maintained that the district court should have addressed her claim for damages caused by the broken roof drain pipe because that issue was preserved in the joint pre-trial order signed by both parties and constituted a separate and independent basis for redhibitory relief.

On July 22, 2005, the district court granted in part Jessup's motion and amended its February 18, 2005, order and reasons. The district court, however, stood by its conclusion that summary judgment in favor of Ketchings was appropriate. The district court held that although the E&G report did not indicate active termites, Jessup nevertheless was aware of past termite damage and had an obligation to further investigate. The district court also held that the water and moisture damage noted in the Gurtler report placed Jessup on notice that the possibility of the broken roof drain pipe existed, and that Jessup failed to further investigate the problem. The district court concluded that because the inspection reports placed Jessup on notice of the termite and roof drain pipe problems prior to the sale and because she failed to further investigate the problems, she waived her right to sue for a reduction in the purchase price based on the damage.

Jessup filed this timely appeal, challenging the district

court's grant of summary judgment on both claims.  This court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

## II.  STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment.  United Fire & Cas. Co. v. Hixson Bros. Inc., 453 F.3d 283, 284 (5th Cir. 2006).  The district court's grant of summary judgment is appropriate if the record shows "'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Id. at 285. (quoting FED. R. CIV. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court "views the evidence in the light most favorable to the non-movant."  Abarca v. Metro. Transit Auth., 404 F.3d 938, 940 (5th Cir. 2005).

## III.  DISCUSSION

### A.  Louisiana Law on Redhibitory Defects

Under Louisiana law, the seller of a home impliedly warrants to the buyer that the property is free from redhibitory defects or vices.  LA. CIV. CODE ANN. art. 2520.  A defect is redhibitory when it renders the property useless, or renders its use so inconvenient that it must be presumed that a buyer would not have purchased the property had she known of the defect.  Id.  Such a defect gives the buyer the right to obtain rescission of the sale.  Id.  A defect also is redhibitory, entitling the buyer to

-10-

recover *quanti minoris* damages for a reduction in the purchase price of the property, when, without rendering the property totally useless, the defect diminishes the property's utility or its value so that it must be presumed that a buyer would still have purchased the property but for a lesser price.  Id.; see Lindy Invs., LP v. Shakertown Corp., 209 F.3d 802, 806 (5th Cir. 2000).

Not all redhibitory defects justify a rescission of the sale or a reduction in the price.  Defects in the property that were known to the buyer at the time of the sale, or defects that should have been discovered through a simple inspection of the property, are excluded from the seller's legal warranty.  LA. CIV. CODE ANN. art. 2521; see Amend v. McCabe, 664 So. 2d 1183, 1188 (La. 1995).  Stated differently, "when the defect complained of is partially apparent, the buyer who, nevertheless, purchases the thing without further investigation must be held to have waived his right to sue in *quanti minoris*."  Pursell v. Kelly, 152 So. 2d 36, 41 (La. 1963).

Simple inspection involves more than a casual observation. Amend, 664 So. 2d at 1188 (stating that a simple inspection "is an examination of the article by the buyer with a view of ascertaining its soundness").  "Rather, it requires the buyer who observes defects to conduct further investigation as would be conducted by a reasonably prudent buyer acting under similar

circumstances.  Whether an inspection is reasonable depends upon the facts of the case." Lemaire v. Breaux, 788 So. 2d 498, 501 (La. Ct. App. 2001).

**B.   Jessup's Redhibitory Defect Claims**

   1.   Termite Damage Claim

Jessup argues that the termite damage in units 512 and 510A was concealed and none of the property inspectors discovered the extent of the damage prior to the sale.  Jessup contends that the district court erred in holding that she was required to further investigate based on the termite damage identified in the reports to other areas of the triplex.  Jessup also claims that Ketchings is a bad faith seller in failing to disclose the termite damage.

Ketchings responds that Jessup acknowledged in her deposition that she received the reports and was aware of the termite damage listed in the reports, including the WDIR. According to Ketchings, if the buyer obtains information from an inspector evidencing some damage, the buyer's decision to forego further inspection operates as a waiver of a more substantial problem that is later revealed.  We agree.

Louisiana law makes clear that when some of the damage is detectable by a simple inspection, the buyer has a duty to investigate further.  Amend, 664 So. 2d at 1188.  If the buyer chooses to purchase the property without further investigation, she waives the right to sue for rescission of the sale or a reduction in the purchase price based on later discovered damage.

-12-

Id.

In Brandao v. McMahon, 857 So. 2d 1 (La. Ct. App. 2003), the Louisiana appellate court faced a case with similar facts and issues. There, the buyers received a property disclosure form indicating that there was termite damage to the property. Id. at 2. Additionally, the buyers signed a WDIR, disclosing that the property had visible evidence of wood destroying insects. Id. After moving in and discovering extensive termite and water damage behind the walls, the buyers filed a redhibitory action against the sellers, seeking a reduction in the purchase price. Id. The buyers contended that the property inspectors did not find any termite damage out of the ordinary and did not recommend an inspection behind the walls where the damage was eventually discovered. Id. at 4. The buyers argued that their knowledge of some termite damage did not prohibit them from recovering in redhibition. Id. at 5.

The Louisiana court disagreed. It pointed out that all of the inspection reports revealed some type of damage to the property, including active termites and evidence of termite damage. Id. at 4. The court determined that "[e]vidence of 'shoddy' work and reports of damage of any kind should have prompted a reasonably prudent buyer to further investigate the damage and perhaps conduct further inspections in order to obtain more professional opinions." Id. at 5. According to the court, the buyers "had a duty to perform further inspections once the

-13-

home inspections revealed damage. Their failure to do so indicates a tacit acceptance evidencing that they were willing to purchase the property as the inspections revealed without further investigation." Id. at 6.

We find Brandao on point and persuasive. Here, similar to Brandao, the termite damage was not entirely concealed. Rather, all of the reports made available to Jessup prior to the sale indicated some termite damage to the triplex. First, Jessup received and signed the Disclosure Addendum, in which Ketchings had checked "yes" in response to whether the property had "ever had termites or other wood destroying organisms." Second, Jessup obtained the E&G report, documenting termite damage in the kitchen of unit 512 and advising Jessup to get the termite history of the property. The report further warned that given the evidence of termite damage, "it should be assumed that some degree of damage is present, visible or not." Third, Jessup received the Gurtler report, which identified termite damage in various areas throughout the three units. The Gurtler report, like the E&G report, advised Jessup to contact Mr. B Services to determine the history of termite treatment and any previous infestation of the house. It also recommended that Jessup obtain the property disclosure statement, which she had already reviewed and signed. Finally, Jessup received and signed a copy of the WDIR from Mr. B Services. The WDIR had a check mark next to the box indicating that "[v]isible evidence of wood destroying

-14-

insects was observed." It also stated that there was scarring on a stud in the closet of unit 512. The WDIR, like the other inspection reports, warned that "[i]f there is evidence of . . . past infestation of termites and/or other wood destroying insects it must be assumed that there is some damage to the building caused by this infestation, even if the damage is not visible to the inspector as of the date of the inspection." Because the reports and Disclosure Addendum made Jessup aware of termite damage,[3] she had a duty to investigate further. Her failure to do so is inexcusable under Louisiana law. See Brandao, 857 So. 2d at 5 (noting that "reports of damage of any kind should have prompted a reasonably prudent buyer to further investigate the damage").

Jessup argues that her case is more like Tarifa v. Riess, 856 So. 2d 21 (La. Ct. App. 2003), and David v. Thibodeaux, 916 So. 2d 214 (La. Ct. App. 2005), because the extensive termite damage was concealed within the property and not apparent to anyone who examined the property prior to the sale. In Tarifa, the inspection reports revealed no signs of active infestation or termite damage, and the sellers represented that the house was under a termite contract and that there were no termite problems with the property. 856 So. 2d at 23-25. The Tarifa court

---

[3] Jessup acknowledged in her deposition that she had reviewed these reports, but she admitted that she had not asked to see the Mr. B Services records.

-15-

concluded that the extensive termite damage discovered after the buyer purchased the house was non-apparent because none of it could be seen without removing the sheetrock.  Id. at 24-25.  The court determined that the termite damage could be classified as a redhibitory defect, entitling the buyer to a reduction in the purchase price.  Id. at 25.

In David, the WDIR indicated old termite damage and scars in three locations in the house.  916 So. 2d at 217.  After the buyers questioned the seller about the report, the seller took the buyers to all three areas and told them that the termites and damage had been taken care of and that the spots were simply old scars.  Id. at 218.  The seller's representations about the damage were consistent with the professional inspection reports and the property disclosure statement, which indicated that termite damage was discovered and repaired in 1990.  Id.  The David court held that the trial court did not err in determining that the active termites and termite damage were a latent defect, entitling the buyer to a reduction in the purchase price.  Id. at 219.

The present case is clearly distinguishable from these cases.  Here, the inspection reports and the Disclosure Addendum received by Jessup indicated some visible termite damage.  Thus, unlike in Tarifa, the termite damage was not totally concealed within the sheetrock.  Although the inspection reports did not reveal evidence of active termites, such evidence is not required

-16-

under Louisiana case law to trigger the duty to further investigate. See Amend, 664 So. 2d at 1188 ("[W]hen some of the termite damage is detectable by a simple inspection, the buyer has a duty to investigate further. If he chooses to purchase the home without further investigation, he waives the right to sue for redhibition or reduction based upon the termite damage."). Finally, unlike in Tarifa and David, Jessup never alleged that Ketchings made representations that there were no termite problems with the property or that the scarring in unit 512 was simply an old scar not worthy of further investigation. Cf. David, 916 So. 2d at 218 ("[I]f the seller represents that suspected defects have been corrected, and simple inspection establishes these representations to be accurate, the buyer need not investigate further."). In fact, the record does not indicate that Jessup ever asked Ketchings about the termite damage identified in the reports or the past infestation disclosed in the Disclosure Addendum.

Jessup's argument that Ketchings is a bad faith seller in that he failed to disclose the termite damage is also unsupported by the record. Ketchings indicated on the Disclosure Addendum that the property had "had termites or other wood destroying organisms." In addition, Mr. B Services, the exterminator Ketchings had under contract for the property, provided Jessup with the WDIR, which noted that "[v]isible evidence of wood destroying insects was observed," and that the property was to be

-17-

treated under its current contract.  Finally, Ketchings testified that he was not aware of these problems, but that had he known of these problems, he would have disclosed them.  Given this record evidence, it is clear that Ketchings provided Jessup with information that there was termite damage.

Because Jessup failed to investigate further after she was aware of some termite damage, she waived her right to sue for a reduction in the purchase price based upon the termite damage. See Amend, 664 So. 2d at 1188.  Accordingly, the district court did not err in granting summary judgment in favor of Ketchings on Jessup's termite damage claim.[4]

### 2.    Broken Roof Drain Pipe Claim

Jessup next argues that the broken roof drain pipe, which resulted in water leaking into and under unit 510B and in water damage to the foundation, sidewalk, and front porch of the property, was hidden and non-apparent.  Jessup contends that the district court erred in concluding that the Gurtler report placed her on notice that the possibility of water damage existed and that she waived this claim by failing to further investigate the problem.  Jessup claims that the damage identified in the Gurtler report is not in the same area of the property as the roof drain pipe.  Finally, Jessup maintains that Ketchings is a bad faith

---

[4]  Because we hold that summary judgment was proper on Jessup's termite damage claim, we need not address Ketchings's remaining arguments on this claim.

-18-

seller because he failed to disclose that water was leaking into unit 510B when it rained.

Ketchings responds that the district court properly granted summary judgment on this claim because Jessup waived her right to recover for this redhibitory defect by failing to further investigate the cause of the water damage. Ketchings asserts that the Gurtler report placed Jessup on notice that this problem existed when the report noted damages to the wood and ceramic floors in unit 510B, moisture damage to the rear bedroom ceiling in unit 510B, moisture staining to the right wall of the breakfast room in unit 510B, moisture damage in the bedroom in unit 510A, and water damage to the stairwell plaster in unit 512.

As with the termite redhibitory claim, "[a]pparent defects, which the buyer can discover through a simple inspection, are excluded from the seller's legal warranty." Amend, 664 So. 2d at 1188; see also LeMaire, 788 So. 2d at 501 (applying this standard to a redhibitory defect based on water damage from a leaky roof). To determine whether a defect is apparent, the court considers whether a reasonably prudent buyer, acting under similar circumstances, would have discovered the defect through a simple inspection of the property. Amend, 664 So. 2d at 1188. If all of the damage is concealed within the property's structure, it is considered unapparent because it is not discoverable by a simple inspection. Id. In such situations, the buyer has no obligation to further investigate. Id. On the other hand, when some of the

-19-

damage is detectable by a simple inspection, the buyer has a duty to inspect further.  Id.  If the buyer chooses to purchase the property without further investigation, she waives the right to sue for rescission of the sale or a reduction in the purchase price based upon the damage.  Id.

In this case, the inspection of the property did not reveal any of the damages associated with the broken roof drain pipe in the wall of unit 510B.  Rather, the damages caused by the pipe were not apparent defects and were discovered only through running a video down the drain and excavation of the property.

The notations in the Gurtler report, relied upon by the district court and by Ketchings, do not point to the broken roof drain pipe as the source of the damages identified in the report because those damages are not in the same location as the pipe. The damages to the wood and ceramic floors in unit 510B refer to the bath near the closet on the second level, nowhere near the location of the broken roof drain pipe.  The moisture damage to the bath ceiling and rear bedroom ceiling in unit 510B is also located on the second level.[5]  The moisture damage to the left wall of the bedroom in unit 510A is on the second level, not even

_____

[5]  The location of the breakfast room in unit 510B is not apparent from the floor plans located in the record.  Even assuming it is on the first level near the kitchen in unit 510B, there is nothing in the record to indicate that the "moisture staining" on the "right wall of the breakfast room" has anything to do with the drain pipe, and Gurtler's affidavit supports this view.

-20-

on the common wall shared by the units.  Finally, the water damage in unit 512 also appears to be unrelated to the roof drain problem because unit 512 is located on the upper levels of the triplex and is not in close proximity to the site of the broken pipe.

Our conclusion that the damage identified in the report is different from that caused by the broken roof drain pipe is confirmed by the affidavit of Michael K.A. Gurtler ("Gurtler"), who performed the inspection of the property and prepared the Gurtler report for Jessup.  Gurtler explained that "he observed no evidence of flooding or other problem in unit 510B which would have served as the basis for further inquiry" and asserted "[t]hat he was not aware of any damage to or blockage whatsoever of the roof drain line."  Gurtler further averred that "erosion damages beneath unit 510B and beneath the sidewalk and front porch of the property . . . were hidden beneath the slab and the sidewalk and were not apparent to him and were not discoverable from a visual inspection of the property . . . ."

Nothing in the reports placed Jessup on notice that this problem existed.  Accordingly, the district court erred in holding that Jessup waived her right to recover for this redhibitory defect.  See Amend, 664 So. 2d at 1188.[6]  Because we

_____

[6]  We also are not persuaded by Ketchings's equitable argument on express waiver.  See Appellee's Br. at 20.  The district court correctly concluded that Jessup did not expressly waive the warranty against redhibitory defects because the Act of

-21-

conclude that the district court erred in granting summary judgment on this claim, we need not reach Jessup's argument that Ketchings is a bad faith seller with respect to the broken roof drain pipe. We also express no view on Ketchings's argument that Jessup had a duty to tender the property before bringing this claim. These issues have not been developed by the district court, and it is not clear to us that the present record adequately resolves these questions. Under these circumstances, we conclude that it is preferable that the parties' remaining contentions with respect to the broken roof drain pipe claim be addressed in the first instance by the district court on remand.

## IV.  CONCLUSION

For the reasons stated above, we AFFIRM the district court's grant of summary judgment on the termite damage claim, and REVERSE and REMAND the district court's grant of summary judgment on the broken roof drain pipe damage claim.

AFFIRMED IN PART; REVERSED and REMANDED IN PART.

---

Sale does not contain the waiver of redhibition. See Williston v. Noland, 888 So. 2d 950, 952 (La. Ct. App. 2004) (stating that for an express waiver of redhibition to be effective under Louisiana law, the waiver must, inter alia, "be contained in the sale or mortgage document").