JiPETERS, Judge.
This is a redhibition suit in which the plaintiffs, Stephen Todd Sydnes and Shannon *421 V. Sydnes, seek a reduction of the purchase price of a house they purchased from the defendants, Edward C. Harwell and Linda A. Harwell. The trial court rendered judgment in favor of the defendants, and the plaintiffs have appealed.
FACTS
Sometime before December of 1993, Stephen Sydnes settled a workers’ compensation claim and decided to invest the proceeds in rental property. In the search for investment property, he and his wife learned that the house owned by the defendants on Northview Drive in Alexandria, Louisiana, was for sale. The plaintiffs made their initial inspection of the house accompanied by their realtor, Matt Marks; their son; and Mr. Harwell. The defendants were still living in the house at the time, and Mr. Harwell testified that he remained outside with the family pet as the plaintiffs |2first viewed the interior of the house. '■
Mr. Sydnes testified that upon the first visit he felt the house was in good condition and he was relatively pleased with the prospect. Before concluding their inspection that day, the plaintiffs “thoroughly” examined the house a second time. Mr. Sydnes inspected the house two other times before the purchase. The first time he was accompanied by a contractor hired to give the plaintiffs an estimate of the cost of the improvements necessary to bring the house up to suitable rental standards. During this visit, Mr. Syd-nes noted he would have to install a tub kit in the bathroom and repair the bathroom window. Based on this visit, he also decided to replace the paneling in one of the bedrooms with sheetrock. On the next inspection, the Mr. Sydnes brought a painter who provided him with an estimate of the cost of painting two bedrooms.
Also, sometime prior to the sale, the defendants supplied the plaintiffs with a “Property Condition Disclosure Form” which indicated the house contained no known problems or defects. The record is unclear as to exactly when in the sequence of events this disclosure occurred. The form was offered in evidence and reflects that the defendants signed it on July 15, 1993, and the plaintiffs acknowledged receipt of it on November 18, 1993. The house was thirty to forty years old, and the defendants had only owned it approximately twelve years.
The transfer of title occurred on December 9, 1993, for the purchase price of $28,500.00. By agreement, the defendants remained in the house for a short period after the sale, but within ten days, had vacated the premises.
Mr. Sydnes’ first visit after the purchase was on December 16, 1993, at which time he discovered that all utility services had been disconnected when the defendants moved. When he contacted the City of Alexandria Department of Utilities to have the services restored, he learned that the house would first have to |gbe inspected by the city. The following day an employee of the city utility department inspected the gas lines and informed Mr. Sydnes that the vent pipe connected to the hot water heater and a cut-off valve at the outside gas meter would have to be replaced before gas service could be restored. These corrections were made and utility service was restored, including gas, water, and electricity.
Mr. Sydnes sought listing of the house with the Alexandria Housing Authority and the Rapides Parish Housing Authority in an effort to rent it to low income tenants and receive a federal subsidy in return. Before listing it, the Alexandria Housing Authority inspected the property to ensure that it met that agency’s specifications. As a result of this inspection, Mr. Sydnes learned of potential violations of the city electrical code. To determine exactly what problems he had, Mr. Sydnes again called the City of Alexandria which promptly sent an electrical inspector to examine the property.
The inspection of the property revealed numerous violations, including:
1. The supply to the central air conditioning unit was improperly “mainlined” (meaning it was connected to the same side of the breaker as the main power) to the City utility line. The central air power supply came from the main lugs of a breaker box, went through holes in the side of the house, through the attic, out the *422 other side of the house and down to the central air unit. It was not in conduit and had no disconnect.
2. A wire was protruding from the exteri- or wall of the laundry room. The wire led into a plastic box which was apparently intended to be a GFI receptacle.
3. The fuse box in the bonus room had twenty amp wires connected to thirty amp fuses.
4. The old breaker box on the outside of the house contained inadequately sized breakers. Therefore, the box had to be replaced.
5. There was an exposed 220V wire feeding the dryer in the laundry room which was nailed to the wall. It was also not contained in conduit.
6. There was an extension cord extending from the washer/dryer plug and through the wall to feed the dishwasher. It was also improperly | connected to the fuse box.
7. There was a live wire which fed the refrigerator laying on the hot water heater.
8. The plug in the bathroom had to be upgraded to a ground fault because there had been some recent remodeling in the bathroom.
9. An extension cord ran from a hot electrical outlet that was covered by sheetroek, down the interior of the wall, out the bottom of the wall, under the carpet, and into a hole that fed a light in the closet.
10. There were other “hot” receptacles buried under sheetroek in the master bedroom.
11. The gas unit needed a disconnect and the wires had to be placed in a junction box.
12. There was a plug buried under the Formica back splash in the kitchen.
13. The electrical wires were not contained in conduit.
Mr. Sydnes had arranged for two electricians to accompany the city inspector during his inspection and they prepared cost estimates of the work required to qualify the house for listing with the housing authorities. Mr. Sydnes promptly contracted to have this repair work completed.
The plaintiffs then leased the house to Debra Lynn Thompson who moved in on March 1, 1994. She had originally planned to occupy the house on February 1,1994, but the repair work delayed her occupancy for one month. Shortly after Ms. Thompson moved into the house, she complained to her landlord that the simultaneous use of her washing machine and dishwasher caused water to overflow onto the floor. An investigation revealed that the washing machine and dishwasher were connected to the same drain line which was not an adequate size for the quantity of water flowing through the drain. Mr. Sydnes then had the drain line replaced.
On February 15, 1994, the plaintiffs brought this action in redhibition seeking 15a reduction in the purchase price in an amount equal to the total cost of the repairs. Prior to filing suit, they made no effort to contact the defendants concerning the complaints, and the first notice the defendants had of any problem associated with the sale was when they were served with the petition. After trial, the trial court rendered written reasons for judgment concluding the plaintiffs did not prove redhibitory defects sufficient to recover and dismissed the plaintiffs’ action. It is from this judgment that the plaintiffs have appealed.
ANALYSIS
Initially we note that by virtue of Acts 1993, No. 841 § 1, the Civil Code articles pertaining to redhibition were revised. However, these revisions did not become effective until January 1, 1995. Because the sale at issue occurred in December of 1993, the law in effect at that time is that which governs the disposition of this case.
Louisiana Civil Code article 2520 allows a purchaser to set aside a sale of a thing containing a vice or defect which “renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.” While a purchaser may have the sale annulled, he may also choose to limit his recovery to a *423 reduction in the purchaser price of the thing. La.Civ.Code art. 2541.
A buyer is precluded from recovering, however, if the defects complained of by the purchaser are “apparent,” meaning those that “the buyer might have discovered by simple inspection_” La.Civ.Code art. 2521. The term “simple inspection” connotes more than a mere casual observation by the buyer; it requires that the buyer examine the thing to ascertain its soundness. Thomson v. Cobb, 570 So.2d 145 (La.App. 3d Cir. 1990), writ denied, 572 So.2d 72 (La.1991). The scope of the buyer’s inspection depends on the facts in each case, including the knowledge and expertise of the buyer, the opportunity for inspection, and the leassurances by the seller. Id. Furthermore, a buyer is not required to examine with expertise or to deface the thing to examine the inner or hidden parts of the thing particularly where the damage can only be discovered by removal of surface coverings. Dodd v. Tucker, 528 So.2d 644 (La.App. 2d Cir.1988); Thomson, supra. The appropriate test is whether a reasonably prudent buyer would have discovered the defects under similar circumstances. Pursell v. Kelly, 244 La. 323, 152 So.2d 36 (1963).
The first issue to be addressed is whether any of the alleged defects constituted vices or defects as defined by Louisiana Civil Code article 2520. The trial court concluded they did not constitute such vices or defects. In his reasons, the trial judge noted that the plaintiffs had open access to the property on at least four occasions; they had full opportunity to examine the property and could have retained any experts they considered appropriate; and because of the age of the house, they could have determined that it would have to be brought up to code standards considering the repairs contemplated. The trial court specifically found that it did “not feel that plaintiff (sic) proved redhibi-tory defect.” We should not set aside a trial court’s findings of fact in the absence of “manifest error” or unless the findings are “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). Whether a defect is latent or apparent is a factual determination. Thomson, supra.
Before the city would provide utilities to the house, the plaintiffs were required to replace the vent pipe on the hot water heater and the cut-off valve on the outside meter at a cost of $350.13. Our jurisprudence has generally held that when a building fails to meet the requirements of a local ordinance, the vendor is liable for the costs incurred to obtain compliance. A Copeland Enterprises, Inc. v. Harimaw, Inc., 528 So.2d 707 (La. App. 5th Cir.), writ denied, 531 So.2d 475 (La.1988). In reaching this conclusion, the fifth circuit stated:
kThe jurisprudence appears to be established to the effect that where a government ordinance mandates certain regulations to be followed, the purchaser is entitled to assume these laws have been complied with; and failure to so comply renders the vendor liable for the cost of making physical corrections which are made necessary because of governmental or quasi-governmental regulations in effect before the agreement to purchase was entered into.
Id. at 712, citing Deshotel v. Higgins, 109 So.2d 805 (La.App.Orl.1959); Rodriguez v. Hudson, 79 So.2d 578 (La.App.Orl.1955).
In the case at hand, the plaintiffs were entitled to assume the house was in sufficient compliance with the local codes to obtain utility service despite the age of the house. Without gas and electricity the house was absolutely useless to the purchaser. Additionally, we do not conclude that a reasonably prudent buyer would have discovered the defects under these circumstances. Thus, we find the trial court was in error in not awarding the expense associated with this repair work. The plaintiffs seek to recover the cost of these repairs, or $350.13. “Normally when a reduction of the purchase price is awarded, the correct measure of such an award is the difference between the sale price and the price a reasonable buyer and seller would have agreed upon if they had known of the defects.” Truelove v. Easley, 521 So.2d 1229, 1233 (La.App. 3d Cir.), writs denied, 526 So.2d 802, 803 (La.1988) (citations omitted). The supreme court in Pur-sell, supra, created an exception to that rule *424 holding that in an action for quanti minoris involving real estate, “the measure of recovery is the amount necessary to convert the unsound structure into a sound one.” Id. at 39, footnote 4. The cost of repairs is one method of determining this amount. Creger v. Robertson, 542 So.2d 1090 (La.App. 2d Cir.1989). However, a purchaser may not recover for repairs that encompass more work than that necessary to make the structure sound. Id. We find the cost of repairs requested herein to be the appropriate amount of recovery for this part of the claim.
IgThe repairs to the electrical system and the associated other expenses present a different situation. There is evidence to indicate that many of the electrical defects would have been apparent to a reasonably prudent buyer. Additionally, the electrical repairs were not necessary to obtain city utility service, but were performed only to comply with the listing requirements of the housing authorities. According to the representatives of the city utility department, the older houses were “grandfathered” meaning they did not have to meet current regulations to receive city utility service. Those defects of more recent origin which might not be subject to the “grandfather” clause were clearly visible to the reasonably prudent buyer. We therefore find no manifest error in the trial court’s denial of these repair costs. Those ancillary costs associated with the carpet and walls in the laundry room, the carpet in the master bed room, the repairs in the kitchen, and the cleaning cost after completion of repairs, were all collateral expenses associated with the electrical repairs and therefore not recoverable.
All the remaining claims of the plaintiff revolve around either the question of whether the alleged defects were apparent or the question of witness credibility. We find no manifest error in the trial court’s ruling rejecting these expenses.
DISPOSITION
For the reasons set forth herein, we reverse that part of the trial court’s judgment rejecting plaintiffs’ request for a reduction in the purchase price for expenses associated with the gas repairs and award judgment in favor of the plaintiffs in the amount of $350.13. The remainder of the trial court’s judgment is affirmed in all respects. Costs of this appeal are taxed equally between the plaintiffs and the defendants.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.