**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 99-30510

_____

DOMANGUE FUR HOUSE, INC.

Plaintiff - Appellee

v.

DISBROK TRADING COMPANY, INC.

Defendant - Appellant

_____

Appeal from the United States District Court
For the Eastern District of Louisiana

_____

July 28, 2000

Before JONES and BENAVIDES, Circuit Judges, and WALTER, District Judge.[*]

WALTER, District Judge.[**]

This is a diversity case arising under Louisiana law. The district court found that a buyer's

failure to inspect the quality and quantity of goods shipped by a seller within a reasonable period,

and a buyer's failure to timely notify the seller of its complaints, bars relief under both redhibition

and breach of contract theories. Defendant / Appellant Disbrok Trading Company, Inc.

("Disbrok") challenges that finding. For the reasons stated herein, we AFFIRM.

**BACKGROUND**

_____

[*]     District Judge for the Western District of Louisiana sitting by designation.

[**]     Pursuant to Fifth Circuit Rule 47-5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances set forth in
Fifth Circuit Rule 47-5.4.

This dispute arises out of a contract between Domangue Fur House, Inc. ("Domangue") and Disbrok for the sale of alligator skins. Domangue was to provide 7,074 alligator skins of suitable quality to Disbrok in return for a total contract price of $2,483,858.40. Domangue is a licensed Louisiana alligator dealer. Disbrok is licensed by the Louisiana Department of Wildlife & Fisheries as a nonresident fur dealer. Disbrok has been in operation for 47 years, and Fred Distenfeld, its vice president, has been personally responsible for purchasing wild alligator skins for 20 years. Domangue has had dealings with Disbrok for eight to ten years prior to 1995.

On October 13, 1995, Domangue sold Disbrok a total of 7,074 alligator hides pursuant to the contract. In November 1995, Distenfeld traveled to Domangue's facility in Louisiana to take delivery of the hides. The district court found that Domangue employees packed the hides in burlap sacks inside a single refrigerated container in accordance with Distenfeld's, and his tanner's, instructions. The court noted that credible testimony supported the conclusion that this was not the usual packing method employed by Domangue and others in the industry.[1] The court further found that Distenfeld did not inspect the alligator skins at the time they were loaded.[2]

The single container of hides left Domangue's facility under Distenfeld's supervision. Distenfeld testified that the container was over packed and overweight, requiring the truck driver to release some of the air from his tires to accommodate the container of hides. Once in New Orleans, Distenfeld had the hides divided and repacked into two separate refrigerated containers. Both containers were shipped by rail to Charleston, South Carolina, where they were then loaded aboard a vessel bound for Italy. In early December 1995, the hides arrived at the Conceria

---

[1] See Findings of Fact and Conclusions of Law, p. 4.

[2] Id.

Michelretilli Tannery ("Michelretilli"), a contract tannery selected by Disbrok. The district court found that:

> The absence of any written report upon the shipment's arrival coupled with the testimony that Mr. Distenfeld received the first complaint from [Dario Protto, the owner and principal tanner at Michelretilli] in January 1996 persuade the Court that, in fact, **no inspection of any significance took place**, at least until January 1996.[3]

Over the course of most of the next year, Disbrok made periodic payments to Domangue totaling $2,250,000.00, leaving a balance on the original contract price of $233,858.40. In February 1996, Distenfeld made his first significant inquiry to Protto regarding the condition of the hides. Distenfeld made this inquiry after a Disbrok customer had expressed dissatisfaction with the first shipment of tanned hides from the Domangue shipment. Protto reported that the quality of the skins was poor.

In March 1996, Distenfeld traveled to Italy to inspect the skins. He testified that, upon his return, he contacted Domangue several times to complain about the quality of the skins. Richard Domangue, Domangue's president, insisted that he did not receive any complaints until June 11, 1996 when Disbrok sent him a facsimile transmission. Distenfeld further testified that, at the time of the complaints, he decided it was imperative to continue to have the remaining skins tanned.

Prior to June 1996, Distenfeld became concerned with the width of the Domangue skins. Based on the total invoiced length in feet of the 7,074 skins received from Domangue, Distenfeld testified that he expected a certain surface area of skins, but the shipment yielded far less.[4] Based upon hotly disputed evidence, the court found that discrepancies did exist between the lengths of

---

[3] See Findings of Fact and Conclusions of Law, March 11, 1999, p. 13. Emphasis added.

[4] Like other purchasers of raw alligator skins, Disbrok measures the belly width of each skin in centimeters to determine the quantity contained in a particular shipment.

some skins as invoiced by Domangue and those received by Disbrok. Despite this problem, Disbrok continued making its contract payments.

In August 1996, Disbrok discontinued its payments. Domangue met with Distenfeld to try to resolve their dispute over the quality and size of the skins. The meeting was unsuccessful, and Domangue filed this lawsuit in September 1996.

In its complaint, Domangue sought the balance of the purchase price, as well as an additional $30,064.50 as reimbursement for state taxes Domangue allegedly paid on behalf of Disbrok. Disbrok counterclaimed for damages under a breach of warranty theory in the amount of $750,000 for the poor quality of the skins and the discrepancy in their length.

Following a trial without a jury, the court entered judgment for Domangue and dismissed Disbrok's counterclaim on March 12, 1999. The court awarded Domangue the full outstanding balance on the contract, $233,858.40.

The district court found that Disbrok failed to conduct a reasonable inspection or to timely notify Domangue of any defects in the shipment, barring Disbrok from raising complaints about either the quality or length of the skins. The court determined, as to Disbrok's complaints regarding the quality of the hides, that:

> The credible testimony adduced at trial persuades the Court that, if the alligator hides had begun deteriorating or were improperly salted at the Domangue facility, a trader with Mr. Distenfeld's experience would have noticed this upon brief inspection. By Mr. Distenfeld's own admission, he conducted none.[5]

The court further found "that Domangue breached its warranty as a seller by supplying skins whose length as represented to Disbrok did not yield the expected amount of surface area in belly

_____

[5] See Findings of Fact and Conclusions of Law, March 11, 1999, p. 10.

4

width."[6]  However, Disbrok's failure to conduct a timely, reasonable inspection or to provide seasonable notification to Domangue regarding the discrepancy in the length of the goods precluded Disbrok's claims on this issue.

On March 25, 1999, Disbrok filed a motion for new trial asking the district court to reconsider its ruling.  In its motion, Disbrok maintained that it never sought to rescind the contract or reject any of the goods, but merely wanted a reduction in the contract price to reflect the quality and length it actually received.

The district court found that a buyer's responsibilities, under Louisiana law, are to conduct a timely and reasonable inspection of the goods it is purchasing and to seasonably notify the seller of any defects discovered.[7]  The court further found that these duties exist regardless of whether the buyer proceeds under a breach of contract or a redhibition theory, and regardless of whether the remedy sought is rescission or reduction in price.[8]  The district court denied Disbrok's motion and stated that "[h]aving failed to discharge either duty, Disbrok is not entitled to rescission, reduction in price, or any other remedy."[9]

After the district court's denial of its motion for a new trial, Disbrok filed this appeal.

**REDHIBITION**

Under Louisiana law, redhibition is the avoidance of a sale on account of some vice or defect in the thing sold which renders it either absolutely useless, or its use so inconvenient and

---

[6]  Id. at 14.

[7]  See Order and Reasons of April 16, 1999, p. 5.

[8]  Id.

[9]  Id. at 8.

imperfect, that the buyer would not have purchased it had he known of the defect. See La. Civ. Code art. 2520 (1995).[10] If the defect is redhibitory, the buyer has a right to rescind the sale. Id.

When a redhibitory defect merely diminishes the product's value or utility, a party can recover *quanti minoris* damages for a reduction of the purchase price without having to return the defective product. Id. However, "the seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things." See La. Civ. Code art. 2521 (1995).

The action for reduction of price or quanti minoris is subject to the same rules that govern an action in redhibition. Bunch v. Hirn, 665 So.2d 1181, 1182 (La. App. 4 Cir. 1995) (citing La. Civ. Code art. 2541 (1995); La. Civ. Code art. 2544 (1952)).[11] In Bunch, the Court stated that

> To recover in an action in quanti minoris, a party must prove a latent defect, its existence at the time of the sale, and the extent of the reduction. **If the defect complained of is apparent, such that it might have been discovered by simple inspection, the purchaser cannot recover**.

665 So.2d at 1182. Citations omitted. Emphasis added. To determine whether the defect is apparent, the trier of fact must consider whether a reasonably prudent buyer, acting under similar circumstances, would discover it through a simple inspection of the object. Crow v. Laurie, 729 So.2d 703, 707 (La. App. 1 Cir. 1999).

The Louisiana Supreme Court has stated that a simple inspection is more than a casual

---

[10] By virtue of Acts 1993, No. 841 § 1, the Louisiana Civil Code articles pertaining to redhibition were revised. These revisions became effective on January 1, 1995 and the transaction at issue took place in October 1995. Therefore, the revised articles govern this case.

[11] La. Civ. Code art. 2541 states, in pertinent part, that:

> A buyer may choose to seek only reduction of the price even when the redhibitory defect is such as to give him the right to obtain rescission of the sale.

observance; it is an examination of the object by the buyer with the view of ascertaining its soundness. Pursell v. Kelly, 152 So.2d 36, 41 (La. 1963); Amend v. McCabe, 664 So.2d 1183, 1188 (La. 1995). The Court has further stated that a simple inspection does not, however, require the buyer to examine the inner or hidden parts of the object to find latent defects, or that he deface the thing while inspecting it. Pursell, 152 So.2d at 41. Whether an inspection is reasonable depends upon the facts of each case and includes such factors as the knowledge and expertise of the buyer, the opportunity for inspection and the assurances made by the seller. Crow, 729 So.2d at 708.

In the case *sub judice*, the district court found that "[a] mere representative sampling of the skins' quality and length at the time of delivery would have been sufficient to reveal some of [the] deficiencies Disbrok has alleged."[12] Under Louisiana law, apparent defects, which the buyer can discover through a simple inspection, are excluded from the seller's legal warranty. La. Civ. Code art. 2521; Amend, 664 So.2d at 1188; Crow, 729 So.2d at 707. Whether a defect is latent or apparent is a factual determination. Sydnes v. Harwell, 651 So.2d 419, 423 (La. App. 3 Cir. 1995).

Based upon our review of the record, this Court finds that the district court was not clearly erroneous in concluding that the deficiencies in the quality and length of the alligator skins were apparent upon simple inspection.

**BREACH OF CONTRACT**

Disbrok also asserts a counterclaim relating to the length of the hides under a breach of contract theory. Disbrok argues that, by delivering skins shorter than those invoiced, Domangue

---

[12] See Order and Reasons, April 16, 1999, p. 6.

7

delivered nonconforming goods, and thus, breached the sales contract. According to Disbrok, the delivery of nonconforming goods is not governed by redhibition principles, but rather by "other rules of sale and conventional obligations." See La. Civ. Code art. 2529. However, any action under art. 2529 is governed by La. Civ. Code art. 2475 which applies to all contracts of sale. Article 2475 states that:

> The seller is bound to deliver the thing sold and to warrant to the buyer ownership and peaceful possession of, and **the absence of hidden defects in**, that thing. The seller also warrants that the thing sold is fit for its intended use.

Emphasis added. Article 2475, like art. 2521 under the Chapter entitled "Redhibition," limits the seller's warranty to hidden defects.

As stated above, the district court found that "[a] mere representative sampling of the skins' quality and length at the time of delivery would have been sufficient to reveal some of [the] deficiencies Disbrok has alleged."[13] The district court's finding that the nonconformity of the skins was discoverable upon inspection of "a mere representative sampling" is not clearly erroneous.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is **AFFIRMED**.

---

[13] See Order and Reasons, April 16, 1999, p. 6.